**CONSOLIDATED NAVAL STORES COMPANY, Appellant,**

v.

**John L. FAHS, Collector of Internal Revenue in the State of Florida, Appellee.**

**No. 15416.**

United States Court of Appeals Fifth Circuit.

Dec. 13, 1955.

E. D. Treadwell, Jr., Treadwell & Treadwell, Arcadia, Fla., for appellant.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to the Atty. Gen., James L. Guilmartin, U. S. Atty., Miami, Fla., Karl Schmeidler, Atty., Dept. of Justice, Washington, D. C., Robert N. Anderson, Walter Akerman, Jr., Sp. Assts. to the Atty. Gen., for appellee.

Before RIVES, TUTTLE and JONES, Circuit Judges.

JONES, Circuit Judge.

Again a question is presented as to whether profits resulting from the sale of land are to be regarded and subjected to Federal income taxation as ordinary income, or be given preferential capital

gains treatment. Involved is Section 117(j) of the Internal Revenue Code of 1939, as amended, the pertinent portion of which is:

"(1) Definition of property used in the trade or business. For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C.A. § 117(j) (1).

Consolidated Naval Stores Company, the appellant here, is a corporation of and conducting most of its business in Florida. As this is a case involving Federal income tax liability we will refer to appellant as the taxpayer. It was incorporated in 1902. At the outset its principal business was that of a naval stores factor. Consolidated Land Company, a wholly owned subsidiary of taxpayer, was organized in 1903, and upon its organization the taxpayer conveyed a million plus acres of land in Florida to the Land Company. In 1920 Florida Industrial Company was created with the Land Company holding fifty per cent. of its stock. The Industrial Company acquired, on its organization, from Land Company, something over a million acres of land, and timber or naval stores rights upon a slightly larger area.

Both the Land Company and the Industrial Company from time to time acquired substantial areas of land from other owners. The lands which these corporations acquired, from whatever source, were timbered primarily with pine suitable for naval stores operations. The plan and pattern of the business ac-tivities of the Land Company and the Industrial Company were substantially the same. The lands were used and operated for the production of turpentine and rosin until the trees had been worked out, this being generally done by others under leases. When the naval stores operations were at an end the timber was sold and removed. From time to time each of these corporations made sales of the cut-over lands which were no longer of value in the production of naval stores and timber. During the period of its corporate existence the Land Company acquired, in addition to the lands it received from taxpayer, over two million acres, and conveyed a slightly greater area to purchasers other than the Industrial Company.

During the period between 1903 and 1931 the taxpayer acquired no land, sold no land, and owned very little land. By 1931 the lands of the Land Company had, for the most part, been worked out and substantially all of the timber had been sold. In 1931 the Land Company was dissolved and its assets, including 414,460 acres of land, were transferred in liquidation to taxpayer. In 1930 the Land Company transferred its fifty per cent. of the Industrial Company stock to taxpayer, in part as a dividend and in part for a money consideration. In 1935 the taxpayer acquired the remainder of the Industrial Company stock. In 1936 the Industrial Company was dissolved and in liquidation it transferred to the taxpayer, among other assets, 1,122,740 acres of land, most of which was cut-over timber land.

The taxpayer acquired at various times, stock of Lake Placid Land Company, a Florida corporation, which owned and operated a large citrus grove at Lake Placid, Florida. By 1944, the taxpayer had acquired ninety-three per cent. of the stock of this company and in that year it was merged with taxpayer resulting in an increase of taxpayer's land ownership by 11,760 acres.

The naval stores industry declined during the years and the character of the business of the taxpayer and the na-

ture of its investments underwent considerable change. It increased its activity in the production of citrus fruit; it utilized a considerable part of its lands in raising cattle; it leased much of its other lands for grazing, hunting and turpentining, or one or more of these purposes; it acquired interests, some of which were controlling, in banking, financial, packing, lumber and other businesses. It held mineral rights in lands of which it had parted with ownership. The naval stores phase of its business finally came to an end in 1949. During the years 1932 through 1952 the taxpayer sold over a million three hundred thousand acres of its land. These sales ranged from two in number totaling 117 acres in 1952, to over a hundred sales aggregating nearly 200,000 acres in 1937 and of 241,000 acres disposed of in forty-odd transactions in 1942. During some of the years the taxpayer reported, for Federal income tax, gains on the sales as ordinary income while in other years it treated its profits as capital gains. In some years the taxpayer had losses from the sale of land which were treated as ordinary business losses and not as losses of capital assets.

In 1946 the taxpayer made nineteen land sales aggregating 3,160 acres resulting in a profit of $26,044. In 1947 it made sixteen sales of 1,170 acres at a profit of $14,898. In 1948 it made fifteen sales totaling 11,800 acres with a profit of $55,142. Gains from land sales in 1946 were 3.1% of the taxpayer's revenue, in 1947, 1.4% and in 1948, 6.6%. During the three-year period of 1946 through 1948 the taxpayer received nearly $400,000 from land rentals and over $2,000,000 of revenue from other sources.

In making its 1946 and 1947 income tax returns, the taxpayer reported profits from land sales as ordinary income. In its 1948 return it treated such profits as capital gains. The Commissioner of Internal Revenue made a determination that the profits from land sales in 1948 were ordinary income and assessed a deficiency which was paid. On the theory that profits from land sales during the three years were capital gains, the taxpayer filed claims for refund which were rejected. Actions were brought against the Collector to recover the taxes paid on land sales profits for the three years. The causes were consolidated, tried to the District Court without a jury, the District Judge made findings of fact and conclusions of law, and, except as to the tax allocable to the sale of breeding cattle which is not here questioned, a judgment was entered against the taxpayer. From such judgment, this appeal was taken.

■ At the outset, the Government reminds us that the District Court found that the lands sold by taxpayer were held primarily for sale to customers in the ordinary course of its trade or business, and says that such finding is conclusive unless unsupported by evidence. The Government also calls to our attention the duty of this Court to affirm unless the disposition of the District Court of the basic factual issue is clearly erroneous. In a recent opinion of this Court it was said:

"Insofar * * * as the so-called 'ultimate fact' is simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, it is 'subject to review free of the restraining impact of the so-called "clearly erroneous" rule.' Lehmann v. Acheson, 3 Cir., 206 F.2d 592, 594. As succinctly stated by Professor Moore, 'Findings of fact that are induced by an erroneous view of the law are not binding. Nor are findings that combine both fact and law, when there is error as to the law.' 5 Moore's Federal Practice, 2d ed., Sec. 52.03 (3) * * *." Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217, 219.

■ The foregoing language was quoted, approved and applied in the more recent case of Goldberg v. C. I. R., 5 Cir., 1955, 223 F.2d 709. It is equally

applicable here. In Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, are listed the prior decisions of this Court dealing with sales of property said to be held primarily for sale to customers in the ordinary course of trade or business. No need exists to relist them here. The Smith v. Dunn opinion sets forth the ingredients of the tests evolved and defined in the decisions of this Court. As there set forth, these tests are:

"What was the nature and character of the taxpayer's title to the property, the reason, purpose and intent of the acquisition and ownership and the period of its duration; and whether the property was held primarily for investment or as a part of the taxpayer's 'stock in trade', i.e., as property bought, held and sold for profit?

"What was the vocation of the taxpayer at the time of the sales and prior thereto, whether a real estate broker or engaged in some similar or allied business, having in mind that he may have more than one business; and considering whether the taxpayer maintained only one office and that for his main vocation, and whether his engagement in the additional business was separable from his investment in the property?

"What was the extent of the taxpayer's activity and 'busyness', and whether the additional business was an occupational undertaking to which he habitually devoted time, attention or effort with substantial regularity; and, if the activities were conducted through a representative, whether those activities were carried on by the representative as a part of his own business and at his own expense or primarily in behalf of the taxpayer, and particularly the character and degree of supervision or control exercised by the taxpayer over the representative?

"What were the extent and nature of the efforts to sell the property with the view of determining whether, in their fundamental aspects, these efforts amounted merely to rendering the investment assets more attractive and hence more salable or to an engaging in the business of developing unimproved real estate for income-producing purposes?" Smith v. Dunn, 5 Cir., 224 F.2d 353, 356.

In few situations would all of the tests be applicable. In some, perhaps a majority, of the cases there are factors casting weight upon each side of the question and in many instances the issue becomes a close one. No single fact, evidentiary or ultimate, will be decisive in the usual case.

The lands of the taxpayer were, for the most part, acquired by its subsidiaries for use in the production of turpentine, rosin and other timber products. It was so used as long as it had value for such purposes. When the land was no longer of value for naval stores operations and the merchantable timber was cut off the land was conveyed to taxpayer and the subsidiaries were dissolved. The property was not bought for resale at a profit, nor was it acquired as "stock in trade" of the taxpayer. It was an asset originally acquired for use in producing the products of the timber growing upon it; and when these became exhausted the objective of its acquisition had been accomplished and the land, for such purposes, became obsolete. The taxpayer, as its naval stores business declined and expired, shifted to other enterprises, to other businesses, but we do not find evidence convincing us that the holding of lands primarily for sale to customers was among its businesses.

At the time of the sales of the property and for some time prior thereto, the taxpayer was operating cattle ranches, citrus groves and a meat processing plant. It supervised investments in corporate enterprises of one kind or another where it had substantial but minority interests. The taxpayer was not a real estate agent or broker; it did not at any time purchase property for the purpose of resale. It did not list any of its lands

for sale with any agent or broker, it advertised none of its property for sale, and did not otherwise engage in sales promotional activity. It refused on occasion to dispose of lands where offers were made at prices in excess of the prevailing market.

The taxpayer, during the years in question, was managing its cut-over lands, it made sales and leases and it had a land department. Upon some of its income tax returns it listed "land" as one of its businesses. Because of these facts and by reason of the number of sales and the areas and amounts involved the Government insists that the taxpayer was selling property held "primarily for sale to customers in the ordinary course of his trade or business."

██ In the conclusions of law prepared by the District Judge it was well said that "whether the taxpayer held its lands at the time of their sales primarily for sale purposes is a question to be determined by the total background of the transactions". As in the Goldberg and Smith cases, supra, and as in the more recent case of Ross v. Commissioner of Internal Revenue, 5 Cir., 1955, 227 F.2d 265, all of which have been decided since this case was before the District Court, the tests and standards of the language of the act have not been met. We conclude that the judgment of the District Court was the result of error in applying the applicable rule of law. We have here property sold in the course of the disposition of lands acquired for a purpose no longer existing, by sales made without solicitation. Our concept of property held primarily for sale to customers in the ordinary course of trade or business is not met by the facts here. That there were a number of sales is true, but after sixteen years of selling, the taxpayer had over 400,000 acres remaining. It is hardly to be expected that a million and a half acres of land in separate tracts could be disposed of in a single sale. Had it been done the demand for taxation at ordinary income rates would probably not have been made. See Chandler v. United States, 7 Cir., 1955, 226 F.2d 403.

The appellee brings to our attention the very recent case of Cohn v. Commissioner of Internal Revenue, 9 Cir., 1955, 226 F.2d 22, presenting the factual question as to whether multiple housing units were intended to be used as rental property or held primarily for sale to customers. The Court stated that there was no fixed formula or rule of thumb for determining the type of question there and here presented, and that each case must rest on its own facts. We are in accord with the doctrine stated but the factual differences prevent the Cohn case from being a precedent here.

There was no dispute as to the evidence in the case before us. The case was tried without a jury. If the Goldberg, Smith and Ross cases had been before the District Court we think it would have reached the conclusion, which to us is inescapable, that there should be a judgment for the taxpayer. So that judgment for the appellant may be entered, the judgment for appellee is

Reversed.