**Vivian SMITH, individually and the Estate of Benjamin Burnet Smith, Deceased, Vivian Smith, Independent Executrix, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15729.**

United States Court of Appeals Fifth Circuit.

April 6, 1956.

Ralph G. Langley, Foster, Lewis, Langley & Goode, Ben F. Foster, San Antonio, Tex., for petitioners.

Harry Marselli, Atty., Dept. of Justice, Washington, D. C., H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Atty., Lee A. Jackson, A. F. Prescott, L. W. Post, John Potts Barnes, Chief Counsel, Int. Rev. Service, John M. Morawski, Sp. Atty., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

BROWN, Circuit Judge.

This is another in that flooding stream[1] of 117(j) (1) (B) cases, 26 U.S.C. § 117(j) (1) (B), 1946 edition, involving the question whether real property, claimed to have been held as an investment for rental, has, at the time of its sale, become "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." If so, the gain is taxable as ordinary income; if not, it is treated as a capital gain.

Except for the holding on the very ultimate[2] issue of the case and which the Tax Court denominated a Finding of Fact, Taxpayer's[3] appeal is based entirely on the Tax Court Findings of Fact and the uncontradicted evidence of record.

From 1930 until 1945, the Taxpayer was engaged in the business of building houses under contract in the vicinity of Houston, Texas. In the late 1930's, he entered the lumber business and engaged in what is known in the construction trade as "speculative building"—the purchase of vacant lots, the construction of houses thereon, and subsequent advertising and sale of the houses to the general public. In 1943, while Taxpayer was still engaged in speculative building and the construction of homes under contract, he and his wife organized and became the sole stockholders of two corporations, San Antonio Homes, Inc., and Richmond Homes, Inc. During 1943 and early 1944 both corporations built houses pursuant to National Housing Agency regulations[4] which severely

1. Many of our prior decisions were listed chronologically in note 3, Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, 356. Since that time the following should be added: Goldberg v. Commissioner, 5 Cir., 223 F.2d 709; Consolidated Naval Stores Company v. Fahs, 5 Cir., 227 F.2d 923; Ross v. Commissioner, 5 Cir., 227 F.2d 265.

2. It held: "The 117 houses sold by petitioner * * * in 1945 and 1946 were held by him primarily for sale to customers in the ordinary course of his trade of [sic] business." Its "Opinion" stated, "It is our conclusion that not only has the petitioner failed to meet this burden, but that the evidence clearly shows that the houses were held primarily for sale and not as an investment * * *."

As to this "Finding" we adhere to Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, 219; Goldberg v. Commissioner, supra, [223 F.2d 711] "'Insofar * * * as the so-called "ultimate fact" is simply the result reached by processes of legal reasoning from, or the interpretation of the legal significance of, the evidentiary facts, it is 'subject to review free of the restraining impact of the so-called 'clearly erroneous' rule.'"

3. Separate income tax returns on a community basis were filed by Benjamin Smith, since deceased, and wife Vivian. Since the community income for the years in issue was derived from the activities of the husband, he will be referred to as the Taxpayer.

4. The two corporations and Taxpayer, as transferee, were subject to these regulations:

(a) For duration of emergency period (September 1939 to September 1945) such housing was required to be held for rental only to specified eligible war workers.

(b) In the event a vacancy occurred re-rental could be made only to war workers (NHA could, on application, grant permission to rent to others.)

(c) After two months' continuous occupancy the tenant had a 30-month option to purchase at a specified price.

(d) One-third of all the houses constructed could be sold, after completion, to a war worker provided he agreed to occupy or hold subject to the regulations.

(e) Any house could be sold to a person who did not intend to occupy it as his dwelling provided the sale was at a price within the specified range and the purchaser agreed to hold subject to the regulations.

(f) Upon application 60 days after completion, NHA could grant permission to sell on other conditions.

Restrictions as to occupancy terminated August 21, 1945, and those respecting sale on September 10, 1945.

restricted and limited the use and disposition of such houses. By permissible transfers in early 1944, both corporations transferred houses to Taxpayer. These included the 177 houses sold in 1945 and 1946, involved herein.

Prior to the organization of the two corporations in 1943, Taxpayer had never been in the business of renting houses. The houses retained by the two building corporations (one-third, not involved here, were sold upon completion) were rented to war workers and, during ownership by the corporations and subsequently by Taxpayer, they remained rented for substantially all of the time during 1944, 1945 and 1946. Rentals were on a month-to-month basis. There were no vacancies for any appreciable length of time, and the demand for housing accommodations in this vicinity during 1945 and 1946 was very heavy.

During 1943 to 1946 Taxpayer maintained an office in San Antonio in which he had three employees, an office manager, an assistant office manager, and a general maintenance man who devoted his full time to keeping the rented houses in good repair in accordance with Taxpayer's policy to keep the houses in an excellent condition. The office was run as a rental office. Taxpayer did not make any effort to sell the rented houses to the tenants or others, did not advertise them for sale, and did not employ any salesmen during 1945 and 1946. From time to time various tenants exercised their options to purchase the houses occupied by them, and, pursuant to the contract, a portion of their rent was applied to the purchase price. When a tenant stated his intention to exercise the option, the initial arrangements were handled by the office manager, but subsequent and final closing details were performed by an independent title company.

At this time Taxpayer had no speculative building projects under way. He commenced planning for one in the latter part of 1946. When Taxpayer did engage in a speculative building project, he would advertise it and employ a salesman to dispose of the houses in that project.

The 117 houses on hand January 1, 1945, were all sold [5] in 1945 and 1946.

Bowing to our accumulated pronouncements, seeking support in them for the Tax Court's action, the Commissioner asserts that the Taxpayer's regular business as a speculative builder, the high frequency and number of sales, and the existence of the tenant's purchase option all combined to make this, not liquidation of investment, but the carrying on of the usual real estate promoter-builder business.

But, as has so often been the case when the Commissioner's gaze has been foreshortened by his too intense preoccupation with some factor elaborated on in our numerous writings, this is to ignore their total teachings. The end object of Tax or District Court is a judgment on a given transaction. The factors discussed and pointed out are aids in that function. They are not ends in themselves, nor the easy escape hatch from total deliberation and conclusion.

▆▆▆ The repetition—with its inevitable expansion—of these guides does reflect a settled determination by this Court that specific factors, or combinations of them, are not necessarily decisive. Thus we decline to hold that one's usual trade or business necessarily freezes all of his dealings inevitably

5. Approximately 75 to 80% were sold to tenants under the option. All (67) of those sold during the first nine months of 1945 were sold to tenants. The option purchase price was less than the market value.

Of the 110 sold in 1945, sales ran from two houses in August and December; three in April and May; five in June; seven in February and September; eleven in January; fourteen in July; fifteen in March; twenty and twenty-one, respectively, in October and November; fifty-nine houses had been held over one year, fifty-one for over six months. The seven sold in 1946 (two in March and five in June) were each held in excess of eighteen months.

within the framework of that calling. On the contrary, we have recognized, e. g., Ross v. Commissioner, supra; Lobello v. Dunlap, 5 Cir., 210 F.2d 465; Delsing v. United States, 5 Cir., 186 F.2d 59, that the fact that the taxpayer as to other properties, in other arrangements or relationships, may have been a real estate dealer does not infect other and different properties which have not been or are not in such "stock in trade" and which have been treated as invested capital. Likewise, frequency of sales—often the mark of efficiency in the business world of selling—is at best an equivocal test. If it is really a capital asset, and the decision is genuinely to liquidate it (and not to use it as the basis for commencing a "new" trade of selling it), we give life to the rule long announced that the taxpayer is entitled to use means which produce advantageous liquidation. Capital gains benefit need not be purchased by unbusinesslike sacrifice of economic values. And, of course, where there is much to sell, there must or may be many sales. Consolidated Naval Stores Company v. Fahs, supra; Goldberg v. Commissioner, supra; Smith v. Dunn, supra; Ross v. Commissioner, supra; Fahs v. Crawford, 5 Cir., 161 F.2d 315; see also Victory Housing No. 2 v. Commissioner, 10 Cir., 205 F.2d 371. Liquidation is realization of value by conversion. Liquidation is not evaporation of value through enforced, slow, protracted, or cumbersome offerings in single or "job lots." Of course, when sales frequency is high, the whole picture must be considered to make certain that this is a natural result from a well-managed liquidation and not the product of an operation in all important respects the substantial equivalent of that followed by one engaging primarily in that calling.

These underlying concepts do not justify, on this record, the Tax Court's conclusion. There is no indication at all that Taxpayer blended his former speculative building operation with this rental project. There was no showing that it was a mere adjunct of his usual pursuit. The office was maintained for the servicing and maintenance of a large rental undertaking. The office dealt with the problems of the tenants, their complaints, the collection of rent, and the maintenance and upkeep of the houses. There was no effort made to sell the houses. There was no campaign. There was no solicitation or sales drive. There was no advertising. The office was entirely passive and did nothing but acquiesce, as Taxpayer was obliged to do, in the exercise of the tenants' options. Every house sold during the first nine months of 1945 and approximately 80% of all those disposed of were sold to a tenant under option. As to each of these, the buyer, as a tenant, came to the rental office as the result of his own initiative only, made inquiry concerning the exercise of the option after which the sale, if made, was closed by an independent title company. This is hardly the way one dealing in houses for sale to achieve a builder-promoter's profit would have done. Especially so since the prevailing real estate conditions gave the houses an attractiveness and a market value in excess of the option price. One seeking a builder-promoter's profit would have discouraged tenants buying and would, perhaps, have followed maintenance and repair policies likely to have discouraged tenants remaining in the houses or buying them under the option. The greatest profit, if he were seeking this, was in the free market of non-option holders. The dealer would have been exploiting these, not tenants who could buy at a less profitable price.

This position the Commissioner, with a masterful capacity for fluid tactics, turns then into the charge that from the beginning all was doomed irretrievably as a sale to customers because the tenancy-option agreement was a continuing offer to sell. If the notion has value, it has long been concealed or unappreciated, for in none of the NHA housing project cases, including those in which the Commissioner prevailed, is

there any indication that this point was urged or considered, e. g., Galena Oaks Corporation v. Scofield, supra; King v. Commissioner, 5 Cir., 189 F.2d 122; Goldberg v. Commissioner, supra; Delsing v. United States, supra; Victory Housing No. 2 v. Commissioner, supra; Home v. Commissioner, 10 Cir., 212 F.2d 637; Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263. But since this goes back to the situation existing at the time Taxpayer undertook to build, this approach is artificial indeed. Only options to buy were extended. There was no correlative obligation to purchase. The entrepreneur had no basis for calculating that he would find the project economically desirable from prospective sales. He was limited in the circumstances when sales could be made. The sales, when permitted, carried heavy restrictions on the buyers. And the persons to whom sales could be made were finally closely circumscribed to tenants exercising options. The Commissioner argues that Taxpayer had a built-in market. Equally so, he had a built-in detraction. If Taxpayer had captive buyers, he was, to them, a captive seller. On objective tests, economic realization depended on rentals, and there is no indication at all that it was differently viewed by Taxpayer personally.

■ On its own findings and the undisputed evidence, the Tax Court's conclusion that as these houses were sold in 1945 and 1946, they were "property held by the Taxpayer primarily for sale to customers in the ordinary course of his trade or business" is clearly errone-ous under the standards we have laid down. Its judgment is therefore set aside with direction to redetermine the taxes in conformity with this opinion.

Reversed.

RIVES, Circuit Judge (dissenting).

The ultimate question of whether the property was held primarily for sale to customers in the ordinary course of business seems to me a matter of logical inference from the evidentiary facts as to which the "clearly erroneous" rule is applicable. 26 U.S.C.A. (I.R.C.1954) § 7482(a); Rule 52(a), Fed.Rules Civ. Proc. 28 U.S.C.A.; United States v. United States Gypsum Company, 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746; Commissioner of Internal Revenue v. Scottish American Co., 323 U.S. 119, 125, 65 S.Ct. 169, 89 L.Ed. 113; Helvering v. National Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Galena Oaks Corporation v. Scofield, 5 Cir., 218 F.2d 217, 219; Burford-Toothaker Tractor Co. v. Commissioner, 5 Cir., 192 F.2d 633, 635. I cannot say that the Tax Court's finding of fact [1] was clearly erroneous. It seems to me a logical and reasonable inference for reasons well expressed in the opinion of the Tax Court.

Further, the Supreme Court has recently and cogently set forth the reasons why the capital gain provisions of Section 117 should be narrowly construed. Corn Products Co. v. Commissioner, 350 U.S. 46, 52, 76 S.Ct. 20.

I, therefore, respectfully dissent.

---

1. The Tax Court, after finding the evidentiary facts, concluded its findings of fact as follows:

"The 117 houses sold by petitioner (and his wife) in 1945 and 1946 were held by him primarily for sale to customers in the ordinary course of his trade or business."