**John L. FAHS, individually and as United States Collector of Internal Revenue for the District of Florida, Appellant,**

v.

**DeWitt E. TAYLOR, Appellee.**

**No. 15946.**

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1956.

Carolyn R. Just, Atty., Tax Div., Dept. of Justice, Washington, D. C., E. David Rosen, Asst. U. S. Atty., Miami, Fla., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Washington, D. C., James L. Guilmartin, U. S. Atty., Miami, Fla., A. F. Prescott, Stanley P. Wagman, Attys., Dept. of Justice, Washington, D. C., for appellant.

Philip E. Paine, Miami, Fla., for appellee.

Before RIVES, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal by the Internal Revenue Director for the State of Florida from a judgment in favor of the taxpayer following a suit for the recovery of income taxes for the years 1942 and 1943. The question presented is whether the

---

trial court erred, in a trial without a jury, in concluding that a loss resulting from the sale of a piece of improved real estate by the taxpayer in 1944 constituted a loss "attributable to the operation of a trade or business regularly carried on by" him,[1] and could thus be carried back to 1942 and 1943.

The essential facts may be briefly stated. The taxpayer was a native of Detroit, Michigan, where his father had long been in the real estate business. He went to Florida in 1923, where in 1925 he acquired substantial acreage which he subdivided and made into a townsite with adjacent farm tracts; the collapse of the Florida real estate boom followed soon thereafter, and taxpayer continued to improve and sell off the lots and farms in the vicinity of the town Kossuthville over the succeeding 27 years; this activity undoubtedly was sufficient to warrant a finding that he was engaged in at least some of the years in the business of selling real estate in Florida.

The taxpayer's father died in 1927, leaving five lots in a subdivision in Detroit which had not been sold. These lots were left in undivided shares to taxpayer and in trust for his sister. They were residential lots in an area which was becoming undesirable for residential purposes. His interest in the property was originally a one-sixth undivided interest, but was later one-third, and by 1939 he had an outright one-half undivided interest. The property was managed by the Detroit Trust Company, as testamentary trustee for the sister and as agent for appellee.

An effort was made between 1932 and 1935 by taxpayer and the Trust Company, as his agent, to break the restrictions to residential use affecting these lots. This was done by the building of a filling station on one of the lots and inviting litigation that ended successfully in 1935 or 1937. This lot was leased thereafter until it was sold in 1944. It was this sale at a loss that is here in question.

During the intervening years taxpayer acquired and operated orange groves and other properties in Florida and was a partner in a general merchandise store in Grosse Point, Michigan, which he visited occasionally. He was also a tire dealer and owned some garage property in Florida. He was divorced in 1940 and conveyed all of his Michigan property, including the lot in question, to the Bankers Trust Company of Detroit, as trustee, to secure the punctual performance of his alimony agreement to pay $3,000 a year to his wife. The conveyance gave the trustee the right to sell such property as necessary to provide for punctual payment, but it also provided that the taxpayer might substitute other property if, in the opinion of the officers of the trustee, this would "entirely and safely secure the punctual payments of the" required sums.

In 1944 this filling station lot was sold by the taxpayer and/or the Bankers Trust Company as to his interest, and by the Detroit Trust Company as to the sister's interest. In the same year taxpayer sold several Florida tracts. They were all sold at a loss.

The only question here is whether the Detroit filling station property was property held in a trade or business regularly carried on by him. This question is the same as that presented when a taxpayer sells at a profit property that he claims he has held as a capital asset, but which the Government contends is a sale of property primarily held for sale to customers in the ordinary course of trade or business.[2] Many cases have been decided by this Court in which that question has been posed. In much the greater number, the positions of the parties and the contentions made by them are reversed from that in which the taxpayer and the Director now find themselves. If such property is sold at a profit it is to the interest of the taxpayer to claim that such property is a capital asset, and the Government attempts to have it found to be property held primarily for sale to cus-

---

1. I.R.C. 1939 as amended § 122(d) (5), 26 U.S.C.A. § 122(d) (5).

2. 26 U.S.C.A. § 117(j) (1).

tomers, because tax rates for capital gains are, of course, much more favorable to the taxpayer.

■ We have repeatedly held that where there is no dispute as to the basic evidentiary facts (and there is none here) and nothing remains but for the trial court to apply the process of reasoning to achieve a correct interpretation of the legal significance of the evidentiary facts, such conclusion as the trial court reaches as an "ultimate fact" is subject to review, not as we review a finding of fact, but freed of the restraint of the "clearly erroneous" rule. The clearest statement of this principle is contained in Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, 219. It was reiterated in Goldberg v. C. I. R., 5 Cir., 223 F.2d 709, and most recently applied in Consolidated Naval Stores Co. v. Fahs, 5 Cir., 227 F.2d 923, 925.

■ In the Goldberg case and in Smith v. Dunn, 5 Cir., 224 F.2d 353, we outlined certain tests that may appropriately be applied to a fact situation in one of these cases as a guide to a correct determination of this troublesome question. We need not list them again. Nor do we cite the many other cases decided in this circuit from which a recognizable pattern of decisions has resulted. These are all cited in Smith v. Dunn, supra.

We have no doubt that if the sale of the Detroit lot here in question had resulted in gain to the taxpayer and he appeared before this Court urging that the sale was of a capital asset and was not of "property held by him primarily for sale to customers in the ordinary course of his business," we would feel that the precedents in this Circuit would constrain the Court to agree with the taxpayer and against the Government. Obviously, we can hold no differently with the parties in reversed positions.

Coupling the complete lack of any real estate business conducted by the appellee in Michigan during the year 1944, or in fact at any time, with the circumstance that this property was at all times here relevant put to the highly personal and restricted use of standing as security for his alimony payments and with actual legal title in a trustee for that purpose, produces a result that cannot justify a finding by the trial court or by us that this lot was held by the taxpayer for sale in the conduct of any business regularly engaged in by him.

The judgment must be reversed and entered for the appellant.

Reversed and Rendered.