Harry P. GAMBLE, Jr., and Gretchen B. Gamble, Husband and Wife, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16106.

United States Court of Appeals Fifth Circuit.

March 21, 1957.

Rehearing Denied April 22, 1957.

Harry P. Gamble, Jr., Harry P. Gamble, III, Gamble & Gamble, Lautenschlaeger & Gamble, New Orleans, La., of counsel, for petitioners.

C. Guy Tadlock, I. Henry Kutz, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., John Potts Barnes, Chief Counsel, John M. Morawski, Sp. Atty., I. R. S., Washington, D. C., for respondent.

Before HUTCHESON, Chief Judge, and CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

In this proceeding we review a decision of the Tax Court which affirmed a determination of the respondent, Commissioner of Internal Revenue, holding that profits made by the petitioner, Harry P. Gamble, Jr., from the sales of real estate in the years 1949 and 1950 were not entitled to be treated as capital gains in computing Federal income taxes, but on the contrary, were ordinary income and taxable as such.

The tax returns for the years involved were for Harry P. Gamble, Jr., and Gretchen B. Gamble, his wife, but since Mrs. Gamble was not a participant in the transactions out of which this controversy arose, our references to the "petitioner" will mean only Harry P. Gamble, Jr. The petitioner was admitted to practice law in 1926 and was commissioned a notary in 1937. From 1926 to 1938 he was a part-time athletic coach. In the middle forties he did part-time duty with the Coast Guard. He is engaged in the practice of law and notary work in the City of New Orleans.

The real estate activities of the petitioner began in July, 1945, when he purchased from the Homesteads in liquidation 36 lots in Canal Street Subdivision of Jefferson Parish, Louisiana. This purchase was at a low price and the lots were subject to substantial delinquent taxes. Similar purchases in the Canal Street Subdivision were made on two occasions in 1946, one of 150 lots in April and 73 lots in September. These lots were acquired at a low price. Exploration for oil was under way a couple of miles distant and the petitioner hoped that oil production would give value to his acquisitions. The exploration resulted in a dry hole. In May of 1946 the petitioner bought from William D. Dutton a number of notes and contracts given to Dutton by lot purchasers. In this

deal the petitioner acquired 24 lots in Morningside Park, Kenner, Louisiana, 30 lots in Baton Rouge, Louisiana, and 11 lots in Country Club Estates in New Orleans. The primary purpose of the petitioner in this transaction was to acquire the notes and contracts, the lots being thrown in, said petitioner, as lagniappe. In 1947 the petitioner bought 142 lots of which 132 were in the Canal Street Subdivision. In 1948 he bought 10 lots in the Canal Street Subdivision and 6 other lots, the latter being sold in the same year. In 1949 he acquired 4 lots and in 1950 4 others, all in the Canal Street Subdivision. The 1950 purchase was made for the purpose of getting rid of a lot owner regarded by him as undesirable.

John R. Kennedy was a real estate broker in New Orleans. He was well known by the petitioner and some of petitioner's lot purchases had been made through him. In 1946 Kennedy proposed to petitioner the improvement of the Canal Street Subdivision. The petitioner gave to Kennedy an exclusive sales agency on the lots in Canal Street Subdivision, reserving to himself the fixing of prices and terms. The agreement was put in letter form on January 20, 1947, and provided for a commission on sales which was to be fifty per cent. of the profits on sales. Kennedy needed funds to finance improvements in the Canal Street Subdivision and borrowed $35,000 from a New Orleans bank, with the petitioner as an endorser of the note. About six months after the loan was made, the bank asked petitioner to take it over which he did, paying the bank and charging it to Kennedy on his books. Kennedy built a bridge over a canal to make the subdivision property more accessible and saleable, he constructed two streets 3,000 feet in length on which a good many of petitioner's lots faced, installed public utilities, and advertised the subdivision property for sale.

Prior to any of these purchases the lots had been platted and streets were dedicated. All of the lots were bought for resale with the expectation of realizing a profit. Petitioner had no office except that from which he conducted his law practice. He had no real estate broker's license. Some of the lots were not seen by petitioner before acquisition and a few were sold without having been seen by him. The lots, for the most part, were narrow, two lots being required for a building site. Sales were negotiated by brokers, with those in the Canal Street Subdivision being handled by Kennedy under his exclusive contract. In 1947 the petitioner made 7 sales including 13 lots. In 1948 the sales were 25 in number and were of 46 lots. There were 73 lots sold in 1949 by 33 sales, one of which was the sale of two lots held for less than six months. In 1950 88 lots were disposed of by 37 sales, and in 1951 there were 44 sales made. The petitioner realized $7,864.25 as income from his law and notarial professions in 1949, and in 1950, $15,529.05. His income from real estate transactions was $9,196.82 for 1949, and $28,783.10 for 1950. During these two years his interest income was $17,680.07 for 1949, and $19,755.85 for 1950.

In the income tax returns filed by the petitioner and his wife for the years 1949 and 1950, the profits from the sales of the lots, with the exception of one lot held for less than six months, were reported as long-term capital gains. The Commissioner of Internal Revenue determined that the lots were held for sale to customers in the ordinary course of his trade or business. The Tax Court, in an unreported opinion, sustained the Commissioner and its decision is before us for review. The petitioner asserts that the Tax Court committed thirty-two errors, most of them being directed to the finding or failure to find by the Tax Court of specific evidentiary facts. The assignments of error, while covering more space in the record than the Tax Court's findings and opinion, present the single question as to whether the Commissioner and the Tax Court were correct in the determination and decision that the lots sold during the

tax years in question were, within the meaning of the statute, I.R.C.1939, § 117(a) (1), 26 U.S.C.A. § 117(a) (1), "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".

Stressing the fact that he did not have any license as a real estate broker, the petitioner contends that the facts will admit of no conclusion but that he was not in the real estate business and hence the lots were not held for sale in the course of his business. On the contrary, he claims, he was engaged in the liquidation of capital investments. The Commissioner asserts before us, as before the Tax Court, that the petitioner was indeed in the real estate business and that the question is one of fact where we are required to affirm the Tax Court if its findings are supported by substantial evidence and are not induced by an erroneous view of the law.

■ The phrase "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business", while having the casual appearance of being readily understood and easily applied, has proved difficult of application and has required repeated consideration by the courts.[1] Each case must be decided on its own facts.[2] The question as to whether property was held by the taxpayer primarily for sale in the ordinary course of business is principally a fact question, and one where the Tax Court has the function of making the original determination through the process of weighing and balancing conflicting facts and factors and drawing from these the inferences and conclusions upon which a decision is to be based.[3] If there is substantial evidence to sustain the findings and they are not clearly erroneous they will be sustained.[4] But where the credibility of witnesses is not involved this Court may be in as good a position as was the Tax Court;[5] and in so far as the so-called "ultimate fact" is simply reached by processes of legal reasoning from, or the legal significance of, the evidentiary facts, it is subject to review free from the restraining impact of the so-called "clearly erroneous" rule.[6]

We have, on several occasions, set forth various tests that have been applied in the decided cases,[7] and we shall not here undertake any restatement of them. In few situations, perhaps in none, would all of the tests be applicable. In some, probably in most, of the cases there are factors casting weight upon both sides of the question and in many instances the issue is a close one. No single evidentiary fact will be decisive in the usual case.[8]

■■ While the ultimate concern is the purpose for which the property was held at the time of the sale, it is necessary to consider also the purpose for which it was held prior to the sale.[9] The fact that the property was originally acquired for rental purposes is a strong factor for not subjecting the profits on a sale to tax treatment as or-

1. Lobello v. Dunlap, 5 Cir., 1954, 210 F. 2d 465.

2. Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353.

3. King v. Commissioner, 5 Cir., 1951, 189 F.2d 122, certiorari denied 342 U.S. 829, 72 S.Ct. 54, 96 L.Ed. 627; Commissioner of Internal Revenue v. Scottish American Investment Co., 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113.

4. Dunlap v. Oldham Lumber Co., 5 Cir., 1950, 178 F.2d 781; Benton v. Commissioner, 5 Cir., 1952, 197 F.2d 745.

5. Benton v. Commissioner, supra.

6. Galena Oaks Corp. v. Scofield, 5 Cir., 1954, 218 F.2d 217; Goldberg v. Commissioner, 5 Cir., 1955, 223 F.2d 709; Consolidated Naval Stores Co. v. Fahs, 5 Cir., 1955, 227 F.2d 923; Smith v. Commissioner, 5 Cir., 1956, 232 F.2d 142; Fahs v. Taylor, 5 Cir., 1956, 239 F.2d 224.

7. Dunlap v. Oldham Lumber Co., supra; Lobello v. Dunlap, supra; Goldberg v. Commissioner, supra; Smith v. Dunn, supra.

8. Consolidated Naval Stores Co. v. Fahs, supra.

9. Galena Oaks Corp. v. Scofield, supra.

dinary income.[10] Defense housing units constructed under war-time priorities restricting the builder to renting and prohibiting sales except under special conditions were not held primarily for sale in trade or business when sales were made after restrictions were relaxed upon the solicitation of returning service men seeking homes.[11] The same is true where property acquired as the site for the construction of rental property was sold after the building plans were deferred by circumstances beyond the taxpayer's control;[12] and also where property is acquired for the production of income and is sold when the income declines.[13]

The petitioner, in the case before us for review, acquired lots during the six years of 1945 through 1950 in thirteen separate transactions. All of them were acquired with the expectation of making sales at a profit. None of the properties were productive of income or acquired for the purpose of producing income. Under such circumstances the inference is justifiable that the lots sold during the years involved were held primarily for resale in the ordinary course of petitioner's business.[14] The fact that most of the purchases were in years prior to the tax years in controversy does not preclude a finding that the sales were in the course of business.[15] The frequency and continuity of sales over a period of time is a recognized test in determining the status of property in such cases as that before us.[16] Although the test has been called an equivocal one,[17] and not controlling,[18] frequency of sales has been emphasized as showing business activity, while isolated sales are noted as indicating the lack of a course of business.[19] We do not have here a gradual and passive liquidation,[20] or the piecemeal disposition of an inherited tract,[21] although the sales of inherited property in liquidation may be such as to be a business within the meaning of the statutory provision.[22] The petitioner made 33 sales during 1949 at a price of $42,375 and a profit of $15,530. In 1950 there were 37 sales for $46,331 and a profit of $18,316. This alone would not, perhaps, be enough to require a determination that the sales were made in the course of petitioner's business, but it is evidence tending to the establishment of such fact.

The petitioner points to his law office as his only place of business and to his legal and notarial practice as his business and his only business. However, a person may be engaged in more than one business.[23] It is significant that the petitioner's profits from his real estate ventures exceeded, during each of the two years in question, his earnings as a lawyer and notary. The

10. Goldberg v. Commissioner, supra.

11. Delsing v. United States, 5 Cir., 1951, 186 F.2d 59.

12. Lobello v. Dunlap, supra. Cf. Ross v. Commissioner, 5 Cir., 1955, 227 F.2d 265.

13. Foran v. Commissioner, 5 Cir., 1948, 165 F.2d 705.

14. Greene v. Commissioner, 5 Cir., 1944, 141 F.2d 645; Jackson v. King, 5 Cir., 1955, 223 F.2d 714.

15. Snell v. Commissioner, 5 Cir., 1938, 97 F.2d 891; Brown v. Commissioner, 5 Cir., 1944, 143 F.2d 468.

16. Dunlap v. Oldham Lumber Co., supra; Goldberg v. Commissioner, supra.

17. Smith v. Commissioner, 5 Cir., 1956, 232 F.2d 142.

18. Lobello v. Dunlap, supra; Goldberg v. Commissioner, supra.

19. See Dunlap v. Oldham Lumber Co., supra, and cases there cited.

20. See White v. Commissioner, 5 Cir., 1949, 172 F.2d 629.

21. Smith v. Dunn, supra.

22. United States v. Robinson, 5 Cir., 1942, 129 F.2d 297.

23. Fahs v. Crawford, 5 Cir., 1947, 161 F.2d 315; Dunlap v. Oldham Lumber Co., supra; King v. Commissioner supra; Smith v. Commissioner, supra.

improving of land to make it more readily saleable is one of the factors which may be reckoned as evidence of engaging in business.[24] As a stimulus to the selling of lots, the petitioner built three houses in the Canal Street Subdivision, selling one of these in 1949 and another in 1950. The petitioner's agent, Kennedy, built a bridge, paved streets and installed utilities in the Canal Street Subdivision and from this activity the petitioner would wholly disassociate himself. We think, however, that the financial assistance given by the petitioner to Kennedy to furnish funds for making improvements, and the exclusive sales contract given to Kennedy on petitioner's Canal Street Subdivision lots with a 50% of profit compensation provided, tend to show an activity of the petitioner in the improvement of his property bringing him into a business relationship to it and giving it a business status. Although the making of direct sales rather than through an agent is evidence of business activity, property may be held primarily for sale in ordinary course of trade or business notwithstanding sales are made only through an agent.[25]

Whether the petitioner held the lots sold by him in 1949 and 1950 primarily for the purpose of sale is a question to be determined by the total background of the transactions.[26] Although specific factors, or combinations of factors, are not necessarily decisive,[27] the entire factual pattern of the case here decided will admit of no conclusion other than that which was reached by the Tax Court. Its findings are free from error and its legal conclusions are sound. Its decision was correct and its judgment is

Affirmed.

24. Snell v. Commissioner, supra.

25. Brown v. Commissioner, 5 Cir., 1944, 143 F.2d 468; McFaddin v. Commissioner, 5 Cir., 1945, 148 F.2d 570.

26. Consolidated Naval Stores Co. v. Fahs, supra.

27. Smith v. Commissioner, supra.