## WELLESLEY A. AYLING AND MARY L. AYLING, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 70866. Filed June 17, 1959.

*George D. Strassner, Esq.*, for the petitioners.
*Clarence C. Roby, Esq.*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in income tax and addition to tax as follows:

| Year | Deficiency | Addition to tax, sec. 294(d), I.R.C. 1939 |
|---|---|---|
| 1954 | $855.57 | $247.12 |
| 1955 | 3,847.07 | ------- |

The issues for decision are (1) whether certain lots sold by petitioners during the taxable years 1954 and 1955 constituted property held primarily for sale to customers in the ordinary course of a trade or business so that the profit therefrom was taxable as ordinary income rather than capital gain; and (2) whether the basis for the property subdivided and the allocation of such basis among the individual lots were properly determined. The addition to tax, conceded by petitioners to the extent of $130.78, is not contested except as it would be reduced by a reduction of the deficiencies.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

Petitioners, husband and wife residing at 5054 Harvest Lane, Toledo, Ohio, filed joint income tax returns on a cash basis for calendar years 1954 and 1955 with the district director of internal revenue at Toledo, Ohio.

Petitioner Wellesley A. Ayling is and has been for a number of years, including those in issue, a full-time employee-salesman for the Mehring Company of Toledo, Ohio, a firm which constructs new homes on contract. Petitioner Mary L. Ayling is a housewife.

In January 1954, petitioners were engaged in a search for a new residence, which effort culminated in their submitting a bid of $16,000 on a house on Harvest Lane in Toledo. Their offer was rejected and on a followup trip to reconsider the house petitioners discovered another one a few doors away on the same street which appeared to meet their needs more adequately. Further investigation resulted in a decision that this latter house, the one they ultimately purchased and presently live in, was the house they wanted.

This house was located on a site 170 feet by 200 feet, which was the northwest corner of an approximately 6-acre tract owned in its entirety by Rae W. and Mildred K. Youngs. The tract consisted of 2 lots, each measuring 200 feet by 660 feet and designated as lot numbers 77 and 78 in Ketcham's Suburban Place, a subdivision in Washington Township, Lucas County. The property other than the housesite was vacant and undeveloped. Although petitioners were interested only in the house and its site, they found the Youngs adamant in their refusal to sell the house without the adjoining vacant land. Two independent offers for only the unimproved portion of the tract had previously been rejected by the Youngs because of their insistence on a single package transaction.

Petitioners felt that they could not financially afford to carry the entire 6-acre tract. However, in order to get the house they decided they would purchase the entire tract and then sell off the unwanted vacant portion of the property. They originally contemplated selling the vacant property in one piece but later gave up this idea.

Petitioners purchased the property for $25,565.18 on April 9, 1954, and took title in Mary Ayling's name by two deeds—one covering the 170- by 200-foot housesite on part of lot 78, and the other for the remainder of lot 78 and all of lot 77.

Shortly thereafter petitioners received two offers to buy the unimproved land as a single piece. Petitioners learned, however, that the offerors planned to subdivide and construct low-cost homes on the property. Feeling that such houses would be unsightly and would impair the value of their home, petitioners rejected the offers. They then concluded that they could best protect the value of their property and liquidate the vacant land which they did not want by subdividing it themselves and disposing of the lots individually under restrictions governing the type of houses that could be constructed. Such restrictions were subsequently drawn up and filed in the form of an indenture with the Recorder of Lucas County on July 30, 1954.

To subdivide property and sell lots in the Toledo area, the approval of a plat must be obtained from the joint Toledo-Lucas County Planning Commission, which required that the property be improved by roads, waterlines, and storm sewers. Petitioners undertook to have this done, and in addition had the property surveyed and cleared. In this connection, they expended the following sums:

| | |
|---|---:|
| Paving | $2,836.40 |
| Waterlines | 3,085.00 |
| Engineering and surveying | 898.50 |
| Clearing and leveling | 712.00 |
| Total | 7,531.90 |

The entire 6-acre tract was replatted and lots 77 and 78 were broken up into 14 smaller parcels, the vacant, undeveloped land (all of the property in excess of the 170- by 200-foot housesite) comprising 12 parcels, and a portion of the original housesite supplying a 13th parcel. The 14th and remaining parcel was the site of the house and was to be retained by petitioners.

Petitioners sold 3 lots in 1954, 8 in 1955, 1 in 1956, and the 13th and last lot in 1957. These 13 lots, upon which petitioners realized a total of $39,850, were sold on the dates and for the prices following:

| Dates sold | New lot number | Selling price | Dates sold | New lot number | Selling price |
|---|---|---|---|---|---|
| Sept. 9, 1954 | 6 | $2,800 | 1955 | 9 | $2,800 |
| Sept. 15, 1954 | 7 | 2,800 | 1955 | 10 | 3,600 |
| Nov. 22, 1954 | 12 | 3,500 | 1955 | 13 | 3,500 |
| 1955 | 1 | 2,700 | 1955 | 14 | 3,150 |
| 1955 | 2 | 2,400 | 1956 | 3 | 3,500 |
| 1955 | 5 | 2,800 | 1957 | 11 | 3,500 |
| 1955 | 8 | 2,800 | | | |

Neither of the petitioners was a real estate broker nor had they engaged in any previous real estate transactions for their own account, except for the sale of a former residence sometime between 1933 and 1940 and two lots inherited by Mary Ayling, one of which they made their residence through the time their present home was purchased. In disposing of the lots here in issue, petitioners employed no real estate brokers or salesmen. The subdivision as a unit was not advertised, but individual lots were the subject of 2- or 3-line classified advertisements in the Toledo Blade on about 12 separate occasions.

To finance the purchase of the house, petitioners in March 1954 applied to the United Savings & Loan Association for a mortgage loan. In connection with this application, Howard St. Alban, treasurer of the association and an appraiser of properties of many years' experience, was dispatched to appraise and evaluate the property for loan purposes. Only the house and its 170- by 200-foot site was considered by the appraiser. Evaluating the lot at $22.50 a

front foot, St. Alban assigned to it a total value of $3,825, and appraised the house itself at $15,058.26. Adding $200 for a shed and coop on the property, he arrived at a total of $19,083.26, or roughly, $19,100. On the basis of this appraisal, the association granted petitioners a loan of $13,000.

Shortly prior to the time of petitioners' purchase, two independent subdividers and builders had attempted to purchase the property here in issue. Clifford C. Loss, Sr., and Joseph Ach, both of whom lived on Harvest Lane in 1954 (although neither knew petitioners before the latter moved to their present home), had been in the building business since about 1947 and had knowledge of the values of property in the area. In 1954, each separately valued and offered the Youngs $10,000 for the vacant undeveloped portion of their property—neither of the builders was interested in the house or its site. The Youngs rejected both offers. Following petitioners' purchase, Loss again attempted to procure the unimproved tract for $10,000, but as indicated above, petitioners refused due to Loss' plans to construct low-cost houses.

During the taxable years, petitioners reported the following income from sources other than the sale of lots:

| Source | 1954 | 1955 |
|---|---|---|
| Mehring Co.—Wages | $9,106.25 | $8,401.95 |
| Lucas County Probate Court appraisal fees | 687.00 | 546.00 |
| Interest | 141.02 | 233.67 |

In their income tax returns for 1954 and 1955, petitioners reported the profit realized on sales of lots ($4,311.81 in 1954 and $11,762.33 in 1955) as capital gain, allocating as a basis for all of the vacant unimproved land $10,000 (of their total purchase price of $25,565.18), to which was added the cost of the improvements.

The lots sold by petitioners were not held by them primarily for sale to customers in the ordinary course of a trade or business.

On the evidence, a fair allocation of the purchase price between the unimproved portion of the property and the house and the 170- by 200-foot lot on which it stood was $10,000 for the former and $15,565.18 for the latter.

OPINION.

Although respondent in his notice of deficiency based his determination that petitioners were not entitled to capital gains treatment on the proceeds from the sale of lots on the fact that petitioners failed to meet the requirements of section 1237, I.R.C. 1954, on brief respondent agrees with petitioners that said section is not controlling in this case.[1]

The primary question for decision, then, is whether the property sold by petitioners during the years involved was held by them pri-

---

[1] Both parties recognize that the 5-year requirement of section 1237 has not been met.

marily for sale to customers in the ordinary course of their trade or business, so as to be denied treatment as a capital asset.[2]

A large number of cases presenting a variety of circumstances has dealt with this question. Basically, each must be decided in the light of its particular facts, which are usually unique in their combination. Common among the cases, however, is the utilization as a guide of a set of general criteria against which the factual circumstances are measured. Among the matters usually considered are the taxpayer's purpose in acquiring and disposing of the property; the frequency and continuity of sales or sales-related activity; and the owner's activities in developing and selling the property. *W. Linton Atkinson*, 31 T.C. 1241; *W. T. Thrift, Sr.*, 15 T.C. 366. No one of these factors is conclusive; rather, the totality of the facts in the individual case controls.

The primary thrust of respondent's argument, and our attention, is directed to the fact that the property here in issue was in the first instance purchased by petitioners with the express intention of reselling it. Petitioners do not deny this—to the contrary, they are the first to say that they did not want the property and that at the time of purchase their financial circumstances dictated disposal in the most expeditious manner possible. This circumstance, however, is not in itself controlling. Considering all of the circumstances, in our view petitioners' activities in connection with this real estate did not constitute a trade or business.

[T]he words and phrases, "trade or business," "ordinary" and "customers" are to be construed in their ordinary and not in an artificially created meaning. Higgins v. Commissioner, 312 U.S. 212 * * *. To be engaged in the real estate business means to be engaged in that business "in the sense that term usually implies." Dillon v. Commissioner, 8 Cir. 213 F. 2d 218, 220. [*Yunker* v. *Commissioner*, 256 F. 2d 130, 133 (C. A. 6), reversing 26 T.C. 161.]

We have here a case of a man and wife acquiring a relatively small tract of undeveloped land solely as a byproduct of a transaction which had for its purpose the procurement of a home highly desirable to them. The record clearly establishes that in order to acquire the house and immediately surrounding land, the entire tract had to be purchased. Petitioners in an effort to dispose of the unwanted part of the land subdivided it, improved it to some extent, and sold it in lots, that being the best way they could devise to protect the value of the remainder of the land they bought for their home. Wellesley A. Ayling was a full-time employee of Mehring Company when this property was purchased and he continued as such during the years involved. Mary L. Ayling was a housewife and took no active part in the subdivision or sale of the property.

---

[2] Sec. 1221(1), I.R.C. 1954.

Petitioners had had no real estate dealings before, except the sale of a former residence and two inherited lots, and there is no evidence that they have had any since the sale of the lots here involved. They did not advertise this property as a subdivision and the only advertising done was the running of a few classified advertisements of 2 or 3 lines in the newspaper on about 12 occasions. The property was not placed in the hands of a real estate agent or broker for sale, but was sold to persons who came to petitioners to buy, and there was very little sales activity in connection with the sale of the property. Petitioners maintained no office for this short-lived venture and their activity in connection therewith was little more than passive. The sale over the course of 4 years of the 13 lots, constituting petitioners' entire holdings (other than their home), hardly establishes a frequency or continuity of sales characteristic of a trade or business. *Smith* v. *Dunn*, 224 F. 2d 353 (C.A. 5); *Consolidated Naval Stores Company* v. *Fahs*, 227 F. 2d 923 (C.A. 5); *Boomhower* v. *United States*, 74 F. Supp. 997.

Although Wellesley A. Ayling was employed as a new-house salesman for a company that constructs new homes, principally to order, there is nothing in the evidence to indicate that his regular occupation had any relationship to his temporary efforts to dispose of his own property. Petitioner does not hold a real estate broker's license and he built no houses on the property. His regular occupation as an employee was obviously not the same as dealing in real estate on his own account. See *Goldberg* v. *Commissioner*, 223 F. 2d 709 (C.A. 5), reversing 22 T.C. 533.

Respondent stresses that petitioners did not sell the excess land as a single parcel but subdivided it, improved it, and sold it as 13 lots. We accept petitioners' testimony that they originally contemplated selling the excess land as a single tract but when they discovered that those who had wanted to buy it intended to place low-cost homes on it, they decided that the best way to protect against this was to subdivide the property themselves and put their own restrictions on it. The improvements made to the property at a rather nominal total cost of $7,500 appear to have been the minimum required by the planning commission and those necessary to make the property salable in lots. It has been recognized in many cases that sellers may take reasonable steps to improve their property to make it more readily acceptable without assuming the mantle of a dealer in real estate business or forfeiting the right to capital gains treatment on proceeds of sale. *W. T. Thrift, Sr., supra; Allen Moore*, 30 T.C. 1306.

We recognize that the cases in which it was held that the property under consideration was not held primarily for sale to customers do not usually involve property which the taxpayer intended to resell immediately after purchase. However, neither do the cases compel

a finding of "business" due to the existence of such an intent. Each case must be decided on the consideration of all the factors involved. Here, we find that petitioners acquired the property for reasons totally unrelated to embarking on a business venture. Considering the record as a whole, we do not believe that petitioners' sale of the undesired and financially burdensome excess property in the manner employed by them, primarily as a measure to protect the property retained by them as their home, transmutes their limited activities over a limited period of time into a business.

In his computation of profit on the sale of the lots here involved, respondent apparently allocated about $22,500 of the original cost to the house and small buildings on the property and allocated only about $3,000 to all of the land. In the opening statement of respondent's counsel, the allocation for the land was revised to $7,000, and on his reply brief, to $6,400 ($25,500 − $19,100). On the other hand, petitioners allocated approximately $10,000, plus the cost of improvements, and plus a portion of the basis of the 170- by 200-foot lot out of which lot 13 was carved, as the cost basis of the 13 lots sold and apportions as the basis of each individual lot sold that percentage of the total basis of all the lots that the sale price of each individual lot was of the total sale price of all the lots. The evidence indicates that two real estate men, living in this neighborhood but previously unknown to petitioners, offered both petitioners and the former owner of the property $10,000 for all of the land except the 170- by 200-foot lot upon which the house stood, and estimated a value of $13,000 to $14,000 on the house and its lot. These offers were apparently made immediately before and immediately after petitioners purchased the land, which is the critical date for determining basis, and both were rejected. We also have the testimony of an appraiser from a lending agency. He appraised the house and lot upon which it stood at $19,100 for purposes of making a loan to petitioners at the time the property was purchased, and his company loaned petitioners $13,000 on the house itself on the basis of his appraisal.

We have found that a fair allocation of the original purchase price between the house and lot on which it stood and the remainder of undeveloped land was $15,565.18 for the former and $10,000 for the latter. We are more impressed with the price the two individuals were actually willing to pay for the undeveloped land and the fact that with a minimum of improvements the undeveloped land was sold for considerably in excess of $10,000, plus the cost of improvements, within a relatively short time thereafter, than we are with the fact that a loan agency appraiser, who admittedly considered only the house and lot and gave no consideration to the remainder of the land, appraised the house and lot at $19,100.

We agree with respondent that petitioners' method of allocating the basis of undeveloped land to individual lots is not logical because numerous factors may enter into the picture between the time the land is purchased and the last lot is sold which might increase or decrease selling prices, whereas the basis must be allocated to the various lots as of the date the land was acquired. There being no evidence that any particular part of the subdivided property was any more desirable for residential purposes than any other part at the time petitioners purchased the land, we believe that the total basis of the unimproved land should be allocated to the 13 lots sold on a square foot basis, as suggested by respondent. The total basis to be used for this purpose will be $10,000 plus the $7,531.90 cost of improvements. We realize that this does not include any of the original cost that might be attributable to lot 13, which was carved out of the original housesite lot, but neither have we allocated any portion of the cost of the improvements to the property retained by petitioners.

*Decision will be entered under Rule 50.*