George W. Taylor and Margaret Taylor, Husband and Wife, et al. [1] v. Commissioner. Taylor v. Commissioner
Docket Nos. 74910, 74911, 75001, 75002.
United States Tax Court
T.C. Memo 1960-91; 1960 Tax Ct. Memo LEXIS 198; 19 T.C.M. (CCH) 468; T.C.M. (RIA) 60091; May 9, 1960
*198 1. Two adjacent tracts of timber and timberlands found by three individuals, referred to collectively as BJR, were acquired through the efforts of BJR in the name of Taylor Bros., the latter supplying all the purchase price, under an agreement whereunder the net profit from the sale of the timber and timberlands would be divided equally between BJR and Taylor Bros. Held: The agreement constituted a joint venture and the properties were acquired and sold by the joint venture. 2. The properties were capital assets in the hands of the joint venture and were not held by the joint venture primarily for sale to its customers in the ordinary course of its trade or business. Sec. 117(a)(1), I.R.C. 1939. Wayne D. Purcell, Esq., 1417 15th Avenue, Longview, Wash., for the petitioners in Docket Nos. 74910 and 74911. Larry Landgraver, Esq., Portland Trust Building, Portland, Ore., for the petitioners in Docket Nos. 75001 and 75002. Jack T. Fuller, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: These cases were consolidated for trial because the principal question in each arises out of the same transaction. Respondent determined *199 deficiencies in income tax and additions to tax against petitioners as follows: Additions to Tax -
I.R.C. 1939
Sec. 294
Sec. 294
Year
Petitioner
Deficiency
(d)(1)(A)
(d)(2)
1953
George W. and Margaret Taylor
$11,965.62
1953
Estate of Roy Taylor, Effie E.
Taylor, Executrix, and Effie
E.
Taylor, individually
11,929.54
1953
Harold R. and Harriet Brownlee
3,466.31
1952
Curtis C. and Oleva Jarrett
1,241.30
$148.28
$ 98.85
1953
Curtis C. and Oleva Jarrett
2,440.38
253.84
169.23
The issues are: (1) Whether two tracts of timber and timberlands were acquired in 1952 and sold in 1953 by a joint venture consisting of Taylor Bros., a partnership, Harold R. Brownlee, Curtis C. Jarrett, and George E. Rubedew, the latter three being referred to collectively herein as BJR, or were acquired and sold by Taylor Bros. alone; (2) if acquired and sold by a joint venture, whether the property constituted property held primarily for sale to customers in the ordinary course of a trade or business so the proceeds therefrom are taxable as ordinary income rather than as capital gain. Findings of Fact Some of the facts have *200 been stipulated and they are incorporated herein by this reference. Harold R. and Harriet Brownlee are husband and wife and filed their joint individual income tax return for the calendar year 1953 with the former collector of internal revenue at Tacoma, Washington. Harold Brownlee was engaged in the real estate and insurance business in Castle Rock, Washington, where he resided, the insurance constituting the major protion of his business. He was licensed as a real estate broker in the State of Washington, but was not licensed to deal in real estate or insurance in the State of Oregon. Brownlee occasionally bought and sold timber on his own behalf but had never engaged in the logging business and had never owned timberland which was logged during the period he owned it. Curtis C. and Oleva Jarrett are husband and wife and filed their joint individual income tax returns for the calendar years 1952 and 1953 with the former collector of internal revenue at Tacoma, Washington. Jarrett, also a resident of Castle Rock, Washington, was engaged in the logging business on a small scale but owned no logging equipment of his own during 1952 and 1953. Prior to 1952, Jarrett, with a partner, *201 had owned and logged several small tracts of timber. George W. and Margaret Taylor are husband and wife and filed their joint individual income tax return for the year 1953 with the former collector of internal revenue at Tacoma, Washington. Roy Taylor, who died in 1955, and Effie E. Taylor were husband and wife and filed their joint individual income tax return for the calendar year 1953 with the former collector of internal revenue at Tacoma, Washington. Effie E. Taylor, as surviving spouse of Roy Taylor, was duly appointed executrix of the estate of Roy Taylor and is presently acting in such capacity. Taylor Bros., a partnership, owned 50 per cent by each of George and Roy Taylor, was formed on October 8, 1937 and was terminated with the death of Roy Taylor in 1955. The offices of the partnership were located in Castle Rock, Washington, and the partnership filed its partnership tax return for the calendar year 1953 with the former collector of internal revenue at Tacoma, Washington. The partnership's activities consisted of contract logging and sale of timber from lands which it had purchased and owned, and the occasional purchase and sale of timberland it did not log, both *202 in the States of Washington and Oregon. In 1952 and 1953, it owned logging equipment worth approximately $200,000 and employed between 60 and 110 employees. The partnership normally logged 20 to 30 million board feet per year. Prior to 1952 the partnership had sold 6 tracts owned by it without logging them and sold another similar tract in 1956 which had been acquired in 1941. These were relatively small tracts which had been acquired primarily with the expectation of logging them at sometime in the future. By 1952 the partnership had logged most of the timber on timberlands owned directly by it and was interested in purchasing timber in order to have a place for its crew and equipment to work when they were not occupied under logging contracts for others. During 1952 the partnership was engaged in logging timber for the Eatonville Lumber Company under a contract requiring the cutting of approximately 80 million board feet of timber. In 1952, George Rubedew, a timber cruiser, who had on occasions in the past bought and sold timber on his own behalf but who owned no logging equipment and had never logged timber himself, learned of the availability for purchase of a 40-acre tract *203 of timber located in Yamhill County, Oregon. Rubedew contacted Brownlee and Jarrett with a proposition to acquire this tract jointly and have Jarrett log it with rented equipment. While it would be necessary to obtain rights-of-way over other property in order to conduct a logging operation on this tract, Brownlee, nevertheless, sought out the owners of the property and secured an oral option to purchase it. BJR also approached George Taylor to interest him in financing the purchase of this tract on a profit sharing basis. On July 2, 1952, Brownlee, "as agent for GEORGE W. TAYLOR," contracted for the purchase of all merchantable timber on the 40-acre tract for $12,000, paying $1,000 down as earnest money. The contract provided that in the event the purchaser could not obtain a right-of-way into the property, the contract would be terminated and the earnest money refunded. It also provided that the purchaser should have the right until October 10, 1955, to cut and remove the timber, all timber remaining on the property as of that date to revert to the owner of the land. BJR began investigating properties surrounding the 40-acre tract in an effort to procure the necessary right-of-way. *204 In the course of their efforts they discovered that an adjoining 80-acre tract contained approximately 4,800,000 board feet of good timber. Inquiry revealed that the property was owned by an absentee owner and that the property was available for purchase for $52,000. They believed this would be a good buy, but being unable to finance it themselves they again approached George Taylor and their discussions led to a decision that Taylor Bros., the partnership, would finance in its entirety the combined 40- and 80-acre tracts with the understanding that the profits to be derived from the two tracts of timber would be divided equally between Taylor Bros., on the one hand, and BJR on the other. On August 4, 1952, Brownlee contacted the owner of the 80-acre tract in California and made a $1,000 downpayment toward the purchase of the property. The purchase was completed on August 7, 1952, when Taylor Bros. paid the balance of the $52,000 purchase price and received a warranty deed for the property in the name of "Roy Taylor and George W. Taylor doing business as TAYLOR BROS." Taylor Bros. also reimbursed Brownlee for the $1,000 downpayment. On September 3, 1952, the option to purchase *205 the timber on the 40-acre tract was exercised by payment of the balance of the $12,000 purchase price by Taylor Bros., and the receipt by them of a timber deed to "ROY TAYLOR and GEO. W. TAYLOR, DBA Taylor Bros." Efforts to secure rights-of-way to both tracts were conducted by the parties. BJR and their attorney, Landgraver, made several trips at their own expense to talk to the adjoining landowners. Taylor Bros. retained a logging engineer to survey the property, to locate existing and possible logging roads into the area over adjacent properties, and to prepare right-of-way applications. Two separate rights-of-way were finally obtained: One on October 8, 1952 for $100, and the other on October 22, 1952 for $2,000. In each case Taylor Bros. furnished the money and took title. Since BJR first contacted George Taylor, the parties had been working together under a verbal agreement. On October 17, 1952, BJR, George Taylor, and Roy Taylor all met in attorney Landgraver's office for the purpose of reducing their agreement to writing. After discussing their business arrangements with Landgraver, he dictated a draft of an agreement. Its provisions were explained to all by Landgraver and *206 some suggestions were made and discussed by the parties. Thereafter the following instrument was executed by the parties in Landgraver's office on October 17, 1952: "ARTICLES OF JOINT ADVENTURE THIS AGREEMENT, Made and entered into this 17th day of October, 1952, by and between GEORGE W. TAYLOR and ROY TAYLOR dba TAYLOR BROTHERS hereinafter designated as Parties of the First Part, and HAROLD R. BROWNLEE, CURTIS C. JARRETT and GEORGE RUBEDEW hereinafter designated as Parties of the Second Part, "WITNESSETH: "THAT WHEREAS the Parties hereto have entered into a joint adventure in the purchase of certain timber and timber lands more fully described as follows: * * *
"whereby Parties of the First Part advanced the purchase price of said timber and timber lands through Parties of the Second Part as a joint adventure under the following terms and conditions, to-wit: "That Parties of the Second Part through their efforts and labors found and secured the timber and timber lands hereinbefore designated and Parties of the First Part advanced and paid for said timber and timber lands. "NO THEREFORE, it is mutually agreed between the Parties hereto that Parties of the First *207 Part and Parties of the Second Part shall share and share alike in all amounts received for said timber and timber lands over and above the original investment less expenses of sale. "It is further mutually agreed that in the event said timber and timber lands are not sold prior to the 1st day of June, 1954, Parties of the First Part hereby agree to pay to Parties of the Second Part fifty per cent of the difference between $125,000.00 and the original purchase price less expenses of the hereinbefore described timber and timber land. In the event that Parties of the Second Part produce a purchaser for said timber and timber lands prior to the 30th day of June, 1954, the Parties of the First Part shall have first privilege of purchasing said timber and timber lands from the joint adventure at the actual offered price subject to the division of profits as hereinbefore designated. "It is further mutually understood and agreed that the profits and liabilities under this joint adventure shall accrue to and be binding upon the heirs and assigns of the Parties hereto as their interest may appear herein." * * *
The date June 1954 used in the fifth paragraph of the instrument reflected *208 the time when Taylor Bros. expected to have its men and equipment free from its other logging commitments and available to work on the 40- and 80-acre tracts. The $125,000 figure used in the agreement was an estimate of the fair market value of the properties agreed upon by the parties. After leaving Landgraver's office in Portland, Oregon, BJR and the Taylor brothers traveled approximately 55 miles to the office of Taylor Bros., Castle Rock, Washington, where a memorandum agreement was dictated by Roy Taylor and signed by BJR on October 17, 1952, which provided as follows: "MEMORANDUM AGREEMENT "For and in consideration of the sum of $15,000.00, ($5,000.00) each, Harold R. Brownlee, Curtis C. Jarrett and George Rubedew, do hereby agree that a charge of six (6) percent interest from October 17, 1952 until sold shall be charged by Taylor Bros. for all moneys invested in certain timber lands in Yamhill County, Oregon, covered by an agreement between Taylor Bros. and the above mentioned parties. Said agreement is titled "Articles of Joint Adventure" and dated October 17, 1952. /s/ Geo. E. Rubedew, Harold R. Brownlee, Curtis C. Jarrett" This latter agreement was not discussed *209 with Landgraver and he knew nothing about its provisions. No provision had originally been made for payment of interest to Taylor Bros. for the money used to purchase the properties, and the provision for interest was created in return for Taylor Bros. advancing BJR $5,000 each. Upon execution of the memorandum agreement, BJR each received from Taylor Bros. a $5,000 check bearing the following typewritten notation on its reverse side: "Advance on Yamhill County Timber Deal." None of the parties made any effort to sell the property; however, in Arril 1953, at about the same time Taylor Bros. received a contract to log 40 million board feet of another company's timber, Taylor Bros. received an offer from Murphy Logging Company to purchase the two properties. The offer was discussed with BJR and all parties mutually agreed to sell the properties to Murphy. The sale of the 80-acre tract for $170,000 was consummated on April 14, 1953, in attorney Landgraver's office in the presence of George and Roy Taylor, Brownlee, Murphy and another individual. On the same date, Murphy took an option to purchase the timber on the 40-acre tract for $15,000, which was exercised and the sale of the timber *210 on this tract completed on June 21, 1953. The purchase money for both tracts was paid to Taylor Bros. In accordance with the "Articles of Joint Adventure," Taylor Bros. delivered to each of BJR, within a few days following the sale of each tract, checks representing their respective one-third interests in 50 per cent of the profits derived from the sales. The $5,000 advances and the interest accruing to Taylor Bros. under the memorandum agreement first being deducted from the proceeds of the 80-acre tract, the three men each received $13,055.23 and $497.25 in respect to the 80- and 40-acre tracts, respectively. Brownlee included the $5,000 advanced to him by Taylor Bros. in 1952 in his gross income from his real estate and insurance business in his original income tax return for the year 1952. He reported the amounts received in 1953 as long-term capital gain in his original return for the year 1953 (Rubedew reported the income in the same manner on his returns after asking Brownlee how he had reported it). In March 1956, at about the time an audit of his 1952 and 1953 tax returns was begun by respondent, Brownlee filed an amended return for 1952 in which he eliminated the $5,000 *211 from his gross business income and noted that he had erroneously reported as income a loan from Taylor Bros., with whom he was joined in a joint venture. Jarrett did not include the $5,000 advance in his 1952 tax return. He reported the entire amounts received from Taylor Bros. from this venture, including the amounts received in both 1952 and 1953, as long-term capital gain in his 1953 return. Taylor Bros.' books and accounts treated the property as being owned by Taylor Bros. The cost of the property was entered in the company's "Inventory Timber Account" and moneys paid to BJR, both the $5,000 advances in 1952 and their share of the profits in 1953, were added to the cost basis of this property. The partnership return for 1953 reported as long-term capital gain the $185,000 received from the sale of both tracts less the cost thereof, including the amounts paid to BJR as above noted, leaving a net gain of $60,873.75. Each partner included his distributive share of the partnership capital gain in his personal return filed for 1953. Also in 1956 Brownlee, acting under the advice of an accountant, consulted when respondent began an audit of his individual returns for 1952 and *212 1953, instituted the preparation and filing of joint venture returns for the years 1952 and 1953. These returns were prepared in the accountant's office with the assistance of both Brownlee and George Taylor and listed as the reporting organization "Taylor Brothers, Harold R. Brownlee, George E. Rubedew & Curtis C. Jarrett." These returns, which identified the nature of the organization as "joint adventure" and its principal business activity as "investments," were filed by Brownlee with the specific authorization of Jarrett and Rubedew and in the presence of Taylor. The 1952 return merely noted "No business transacted except for accrued expenses," while the 1953 return reported the net proceeds from the sale of the two tracts as long-term capital gain and detailed the cost and expenses and distributive shares of the four parties. Ultimate Findings The two tracts of timber and timberlands acquired in 1952 and sold in 1953 were acquired and sold by a joint venture in which Taylor Bros., a partnership, owned a 50 per cent interest and Brownlee, Jarrett and Rubedew each owned one-third of the remaining 50 per cent interest. The property acquired and sold was not property held by *213 the joint venture primarily for sale to customers in the ordinary course of its trade or business. Opinion The first question is whether the two tracts of timber and timberlands were acquired and sold by a joint venture consisting of Taylor Bros. and BJR, or were acquired and sold by Taylor Bros. alone. Respondent determined that the property was acquired and sold by the joint venture, and Brownlee and Jarrett agree. The Taylors, on the other hand, claim the property was acquired and sold by Taylor Bros. alone, that they agreed to pay BJR a finder's fee or commission equal to 50 per cent of the net profit realized from the property, that $125,000 was agreed upon as the estimated fair market value of the property from which the commission could be determined, but that BJR wanted the opportunity to find a purchaser who would pay a greater price in order to increase their commission, and that the "Agreement of Joint Adventure" was executed for that purpose. Section 3797, I.R.C. 1939, includes "joint venture" in its definition of partnership. As with partnerships, the existence of a joint venture is a question of fact and the intent of the parties is the controlling element. The *214 general test enunciated in Commissioner v. Culbertson, 337 U.S. 733, for determining the existence and validity of a partnership is applicable in determining the existence and validity of a joint venture. Beck Chemical Equipment Corporation, 27 T.C. 840. The real intent of the parties is to be ascertained from the terms of the agreement, all of the relevant facts and circumstances, and the conduct of the parties in carrying out the provisions of the agreement. The parties here all agree that the "Agreement of Joint Adventure" reflects the arrangement between them, but they differ as to the relationship which that arrangement created. We are skeptical that any real misunderstanding between the parties could have existed at the time the agreement was made because it seems clear from the terms of the instrument itself and the conduct of the parties thereunder that their intent was to enter into a joint venture in acquiring and disposing of this property. The written agreement was formally drawn by an attorney in the presence of all the parties thereto and after a full discussion among them, and it unequivocally identifies the arrangement as a "joint adventure. *215 " It acknowledges the contributions to the venture of both parties and provides for an equal division of the profits. The liabilities of the venture were to be binding upon the heirs and assigns of the parties as their interests appear in the agreement. The instrument also made provision for termination of the venture in the event the timber and timberlands had not been sold prior to June 1, 1954, and gave Taylor Bros. the "privilege of purchasing said timber and timberlands from the joint adventure" at the highest price offered for it prior to that time. (Italics added.) Immediately following the execution of the "Agreement of Joint Adventure" the Taylors advanced BJR each $5,000 and wrote on the back of the checks "Advance on Yamhill County Deal." Neither the "Memorandum Agreement" prepared by Roy Taylor covering this advance nor the notation on the checks suggests a payment of a finder's fee or commission, and there is no evidence that a finder's fee or commission was ever mentioned or discussed by the parties. The evidence also indicates that a 50 per cent share in the profits would far exceed any reasonable or usual finder's fee and that finder's fees are usually based on either *216 so much per thousand feet of timber on the property or a much smaller percentage of the original price of the property rather than the resale price. Further, the "Memorandum Agreement" entitled Taylor Bros. to charge 6 per cent interest on all moneys invested in the property rather than only on the amount advanced to BJR. Following execution of the agreement all parties made efforts to obtain rights-of-way for access to the property. While Taylor Bros. employed an engineer to cruise the property and lay out possible logging roads, the fee for these services was charged as an expense of the property in determining the net profit. And when Taylor Bros. received an offer for the property, they found it necessary to consult with and obtain the agreement of BJR before selling the property. When the property was sold the difference between the original cost of the property, plus expenses including interest on the Taylors' investments, and the selling price was divided equally between Taylor Bros. and BJR. We think all of the above are indicative of a joint venture. There is only the uncorroborated and somewhat evasive testimony of George Taylor, and the fact that title to the property *217 was taken in the name of Taylor Bros. and treated on their books as being owned by Taylor Bros., to support the claim that the arrangement was not a joint venture as designated in the agreement. The fact that title was taken in the name of Taylor Bros. is not necessarily inconsistent with the existence of a joint venture when it is realized that Taylor Bros. supplied all the money for the venture. And the evidence indicates that Taylor Bros.' books were kept by an accountant who was not advised of the agreement until long after the property was sold. While Taylor Bros. reported the transaction on its 1953 return as a sale of property owned by it, George Taylor did not object to the late filing of tax returns for the joint venture for the years 1952 and 1953 which listed Taylor Bros. as one of the joint venturers and reported the transaction as a sale by the joint venture. In our opinion the weight of the evidence supports respondent's determination that this property was acquired and sold by a joint venture and we have so found. This finding requires a decision of the second question - whether the properties were capital assets in the hands of the joint venture, or were "property *218 held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Sec. 117(a)(1), I.R.C. 1939. There is some confusion in the testimony of the parties with regard to the purpose for which the properties were acquired and held. This is not strange in view of the fact that circumstances were changing from the time the 40-acre tract was first discovered and the entire property was sold, and it is doubtful that the parties had any clear-cut plans with respect to the property which remained constant throughout that period. It appears to us from all the evidence that BJR originally sought to acquire the 40-acre tract with a view to having Jarrett log it; that when in the course of seeking a right-of-way for access to the smaller tract the adjacent 80-acre tract was found to be available at a good price, BJR realized they did not have sufficient capital to acquire and log the properties themselves and so approached Taylor Bros. for the necessary capital and with the view of having Taylor Bros. log it when their current equipment commitments had been fulfilled; that Taylor Bros. was interested because the property was available at a good price and would *219 also give them a place to use their employees and equipment when they ran out of contract work; that by September or early October 1952, BJR realized that Taylor Bros. would not be able to log the property before 1954 and they wanted some assurance that the property would be logged or sold before the timber rights on the 40-acre tract expired. This led to the agreement of October 17, 1952 wherein Taylor Bros. agreed to take over the whole project at an agreed upon minimum figure unless the property was either logged or sold prior to June 1, 1954, and Taylor Bros. was also given the option to buy the property at the highest price offered prior to that time. When the agreement was executed it is doubtful that any of the parties had much hope or expectation that the property would be logged by the joint venture, but there was nothing to prevent it had the opportunity presented itself, and had it been logged prior to June 1, 1954 it apparently would have been logged as a joint venture. When the offer to purchase the property at a price which would produce a profit greater than they could expect by logging it themselves was received, all parties agreed that it was best to sell, which they *220 did and divided the net profits equally as called for in the agreement. Did this property then constitute property held primarily for sale to customers of the joint venture in the ordinary course of its business within the meaning of section 117(a)(1)(A) of the Code? We think not. There are numerous cases dealing with the question whether sales of real estate constitute a trade or business. But those cases are decided on their own facts and serve only to establish certain general guides and point out certain factors that might have a bearing on the question, among which are the taxpayer's purpose in acquiring and disposing of the property; the frequency and continuity of sales or sales-related activity; and the seller's activities in developing, improving and selling the property. Wellesley A. Ayling, 32 T.C. 704. Judged by the usual criteria applied in such cases, there would be little doubt of the conclusion here. We believe the acquisition and sale of the two tracts here involved must be considered together as one transaction, and as such it represents the single isolated sale of real estate by the joint venture. The evidence does not indicate that the parties *221 individually had engaged in the business of buying and selling timberlands. The joint venture made no effort to develop or improve the property, except to acquire rights-of-way in and out of the property. The property was not advertised for sale and none of the parties made any active effort to sell the property. When an offer to purchase was received it was accepted and the parties divided the proceeds and terminated the venture. But most of the cases which apply the criteria mentioned above involve the sale of subdivided residential real estate, and respondent urges that greater emphasis should be placed on the purpose for which the property was acquired and held at the time of sale in the case of property such as this. Even so we cannot agree with respondent that the parties to this joint venture intended to go together into the business of buying and selling timberlands. In the first place, as pointed out above, we do not find from the evidence that the purpose of the parties in buying these properties was primarily for resale at a profit. Secondly, there is no evidence that the parties intended to continue their relationship beyond the logging or sale of this particular property *222 - in fact the evidence is to the contrary. Even if the property was acquired and held for resale at a profit, we cannot view this single transaction as any more than a speculative investment. Cf. Wagner v. Dudley, an unreported case (W.D. Pa., 1958), 1 A.F.T.R. 2d 1991. Repeated participation in transactions such as this could constitute a business, just as could the repeated purchase and sale of residential real estate, but we do not believe that the mere expectation of being able to resell one tract of timberland at a profit puts the seller in the business of selling timberland within the meaning of the statute. James G. Hoover, 32 T.C. 618; Isaac S. Peebles, Jr., 5 T.C. 14; Thomas v. Commissioner, 254 F. 2d 233 (C.A. 5), reversing 28 T.C. 1. And certainly the activities of the parties with respect to this property after it was acquired were not indicative of the active conduct of such a business. We hold that the transaction here involved was the sale of a capital asset by the joint venture in the year 1953, and the profit realized by the joint venture on the sale was taxable to the parties thereto in their respective *223 shares as capital gain in that year. This conclusion results in decisions for petitioners in both of the Taylor cases. Because of other adjustments not in issue in the Brownlee and Jarrett cases, decisions in those cases will be entered under Rule 50. Jarrett did not contest the additions to tax under section 294(d)(1)(A) and (d)(2); however, under the rule of Commissioner v. Acker, 361 U.S. 87, the additions to tax under section 294(d)(2) will not apply. Decisions will be entered for the petitioners in Docket Nos. 74910 and 74911. Decisions will be entered under Rule 50 in Docket Nos. 75001 and 75002. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Estate of Roy Taylor, Effie E. Taylor, Executrix, and Effie E. Taylor, individually, Docket No. 74911; Harold R. Brownlee and Harriet Borwnlee, husband and wife, Docket No. 75001; and Curtis C. Jarrett and Oleva Jarrett, husband and wife, Docket No. 75002.↩