Harold F. Smith, et ux. 1 v. Commissioner. Smith v. CommissionerDocket Nos. 92546, 4041-62.United States Tax CourtT.C. Memo 1963-227; 1963 Tax Ct. Memo LEXIS 118; 22 T.C.M. (CCH) 1146; T.C.M. (RIA) 63227; August 23, 1963R. M. Ginsberg, 1603 Kirby Bldg., Dallas, Tex., for the petitioners. James F. Hart for the respondent. DAWSONMemorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined deficiencies in the income taxes of petitioners for the years and in the amounts as follows: YearDeficiency1958$16,204.1119596,102.951960388.92 Petitioners have conceded some adjustments raised in the statutory notice of deficiency, thus leaving two issues for decision: (1) whether petitioners realized ordinary income or long-term capital gain from the sale of certain houses during the taxable years 1958, 1959, and 1960; (2) whether petitioners are entitled to use the double declining balance method of depreciation over a 25 year life*119 for houses leased during these years under contracts providing for options to purchase. Findings of Fact Some of the facts were stipulated by the parties. The stipulation of facts and exhibits attached thereto are incorporated herein and made a part of our findings by this reference. During the years involved in these proceedings Harold F. and Gertrude Smith were husband and wife, whose residence was 11031 Pinochio Street, Dallas, Texas. They filed their joint Federal income tax returns for the years 1958, 1959, and 1960 with the district director of internal revenue, Dallas, Texas. Harold F. Smith (hereinafter referred to as the petitioner) is a graduate of the Dallas public schools and attended the University of Texas. After leaving the University of Texas, he was employed by the United States Post Office Department until 1942 when he entered the Armed Foreces of the United States, serving in the United States Navy. Following his discharge from the Navy in December 1945, the petitioner returned to his employment with the United States Post Office Department for approximately 1 year. In 1947 he entered the real estate business and started building houses under the name of*120 Harold Construction Company. In the same year he obtained a real estate license from the State of Texas and operated a real estate office. In 1949 petitioner and two other individuals formed the Prairie Development Corporation and built about 550 houses in Grand Prairie, Texas. Upon the liquidation of the Prairie Development Corporation, the petitioner received 14 duplexes and rental property in Grand Prairie, vacant land, and a lumber yard, all of which he still owns. In 1951 the petitioner entered into a joint venture with Investors Diversified Services and built 55 houses in Arlington, Texas. These were built by him individually and Investors Diversified Services financed the operation. After 1947, petitioner engaged in various real estate activities through the following corporations: Texbuilt Corporation, Smith Ready-Mix Concrete Company, Sylvan Heights Corporation, Smithbilt Homes, Inc., Harold F. Smith Company, Inc., Harold F. Smith Investment Corporation. Petitioner either owned a majority of the stock of these corporations or owned them 100 percent. All the corporations built and sold houses to customers in the ordinary course of business. The corporate return of*121 Smithbilt Homes, Inc., for the period June 1, 1958, to May 31, 1959, reported total sales of $108,138.46. Petitioner, either individually, in joint ventures, or in connection with his corporations, has built approximately 2,500 houses for sale to customers in the ordinary course of his business. Only 55 were built by Harold F. Smith individually. During the years in issue and prior thereto the petitioner was an active member of the National, State, and County Chapters of the National Association of Home Builders. He was also a director of the Dallas Chapter of the National Association of Home Builders for 13 years and served as its president in 1956. He has had extensive experience in the home building industry and is well informed as to the insured housing programs of the Federal Housing Administration and the Veterans Administration. On December 31, 1951, petitioner purchased unimproved land in the City of Arlington, Texas, for $80,385. On April 9, 1952, he filed a plat for the Meadowbrook Park Addition to Arlington, which contained part of the land purchased by him on December 31, 1951. This plat was duly recorded in the Deed Records of Tarrant County, Texas. Then, on July 1, 1953, petitioner*122 filed a plat for the Meadowbrook Park Addition No. 2 which contained part of the land purchased by him on December 31, 1951. This plat was also recorded in the Deed Records of Tarrant County. On February 7, 1952, the Fort Worth office of the Federal Housing Administration issued a Subdivision Report to petitioner pertaining to the subdivision of Meadowbrook Park Addition to the City of Arlington. This report outlined the requirements for construction of one-family dwellings and stated that the Federal Housing Administration would consider applications for loan insurance on individual properties under the subdivision program. The development of raw land in accordance with the Subdivision Report makes it easier for individual houses to be insured later by the Federal Housing Administration. On May 8, 1956, Smith Ready-Mix Concrete Company conveyed 23 lots in the Meadowbrook Park Addition No. 2 to petitioner, which lots were included in the plat previously referred to. On May 8, 1957, Smithbilt Homes, Inc., conveyed seven lots in the Meadowbrook Park Addition to petitioner, which lots were also included in the plat previously mentioned. During the year 1957 the petitioner built*123 30 houses of brick veneer construction on the 30 lots previously purchased from Smith Ready-Mix Concrete Company and Smithbilt Homes, Inc.On September 4, 1958, petitioner purchased three houses in Meadowbrook Park Addition No. 2 to the City of Arlington from Smithbilt Homes, Inc., and another five houses in Meadowbrook Park Addition No. 3 from Smithbilt Homes, Inc., on November 5, 1958. None of the 30 houses were inspected by the Federal Housing Administration during their construction. The minimum down payment on a house not inspected by Federal Housing Administration during construction and less than 1 year old was 10 percent of its appraised value. Prior to August 5, 1957, the minimum down payment on a house not inspected by the Federal Housing Administration during construction and at least 1 year old was 5 percent of its appraised value. After August 5, 1957, the minimum down payment under Federal Housing Administration regulations was decreased from 5 percent to 3 percent. Petitioner is a low-cost home builder and constructed the 30 houses primarily to reach people in the three and four hundred dollar per month salary bracket. During the years 1957 and 1958 the petitioner*124 placed and paid for advertisements in the Arlington Citizen and Arlington Journal newspapers in the real estate for sale section pertaining to the houses in issue. Both of these newspapers had separate sections for advertising rental property and the customer determined whether the advertisement was placed in the rental section or the real estate for sale section. The October 10, 1957, edition of the Arlington Journal contained the following advertisement under a section entitled Real Estate [For Sale]: $190 MOVES YOU TODAY into this 3 BEDROOM BRICK Many Special Features Veteran or Non-Veteran No Closing Cost Model Home - 1901 Glenhaven New York Drive across from Berry School HAROLD F. SMITH CR5-2359 The October 17, 1957, edition of the Arlington Journal contained the following advertisement under a section entitled Real Estate [For Sale]: $190 MOVES YOU IN TODAY THIS 3-BEDROOM BRICK Many Special Features - Veteran or Non-Veteran No Closing Cost - See Model Home, 1901 Glenhaven Across Street from Berry School on New York Drive HAROLD F. SMITH CR5-2359 The October 21, October 28, and November 4, 1957, issues of the Arlington Citizen and the October 24, *125 October 31, and November 7, 1957, issues of the Arlington Journal contained the following advertisement in the "Real Estate" section of the newspapers: $190 MOVES YOU IN TODAY THIS 3-BEDROOM BRICK $9400 Many Special Features - Veteran or Non-Veteran No Closing Cost - See Model Home, 1901 Glenhaven Across Street From Berry School on New York Drive HAROLD F. SMITH CR5-2359 The September 8 and September 22, 1958, issues of the Arlington Citizen and the September 11 and September 18, 1958, issues of the Arlington Journal contained the following advertisement under the "Real Estate" section: IMMEDIATE POSSESSION No Closing Costs - No Red Tape 901 NEWTON $6950 2bdrm. frame. $140 moves you in. * * * $200 to $230 moves you in. 2125 - 2127 - 2129 - 2131 - 2133 BROOKSHIRE New 3 bedroom bricks. 1 1/2 baths, carpeted. $11,000 to $11,900 Our plan allows you to move in and you are given credit for 1/3 of your monthly payment toward your down payment. HAROLD F. SMITH & CO.1901 Glenhaven St. CR5-2359 The houses located at 2125, 2127, 2129, and 2131 Brookshire are houses involved in this proceeding. The September 29, 1958, Arlington Citizen and the September 25, 1958, Arlington*126 Journal contained the following advertisement in the "Real Estate" section: IMMEDIATE POSSESSION $200 to $230 MOVE YOU IN 2125 - 2127 - 2129 - 2131 - 2133 BROOKSHIRE New 3 bedroom bricks, 1 1/2 and 2 baths, carpeted. $11,000 to $12,950 Our plan allows you to move in and you are given credit for 1/3 of your monthly payment toward your down payment. HAROLD F. SMITH & CO.1901 Glenhaven St. CR5-2359 The November 14, 1957, Arlington Journal contained the following advertisement in the "Real Estate" section: FOR LEASE With option to purchase - 3 bedroom brick homes. Located close to shopping center and schools. 1/3 of rent credited toward purchase price. HAROLD F. SMITH 1901 Glenhaven St. CR5-2359 The November 21, 1957, Arlington Journal contained the following advertisement in the "Real Estate" section: $190 MOVES YOU IN TODAY $9400 THIS 3-BEDROOM BRICK Many special features. No closing cost. Model Home - 1901 Glenhaven. Corner Glenhaven and New York Ave. Also will trade your equity in on 3 bedroom bath and a half. F.H.A. HAROLD F. SMITH CR 5-2359 The July 13, 1959, edition of the Arlington Citizen contained the following advertisement in the "Real*127 Est. Imp.": F H A MINIMUM DOWN PAYMENT 3 bedrooms, 1 and 2 baths, single and double garages. 1101 Moore Terrace, 2124 Brookshire, 2129 Brookshire J. RUSSEL [RUSSELL] SMITH "Honest John" CR 4-5209 CR 5-6147 The house located at 2129 Brookshire is one of the houses involved in this proceeding. J. Russell Smith is petitioner's brother and petitioner obtained a real-estate license for him. He represented petitioner and was paid commissions for leasing and selling some houses involved in this proceeding. Advertisements were placed in the newspapers by J. Russell Smith pertaining to the houses in issue which were paid for and sanctioned by petitioner. Twenty-five of the thirty houses built by petitioner were leased with options to purchase before the close of 1957. Three houses were leased on January 20, 1958, March 7, 1958, and April 26, 1958, and the house at 1901 Glenhaven was leased to J. Russell Smith on October 1, 1958. Six of the eight houses purchased by petitioner from his corporations in 1958 were leased with options to purchase between September and November 1958. All of the lease agreements required the payment of 2 months' rent upon signing of the lease. *128 They also required the tenants to maintain the property as if the lessee "* * * were the fee simple owner of the property." Each lease agreement granted the lessee the option of buying the premises for a stated price, which was $9,400 for the houses built by petitioner and between $10,950 and $12,950 for the houses acquired by petitioner in 1958. Each lease agreement contained the following provision in paragraph 2 under "Special Provision - Option to Buy": At the time Warranty Deed is given to said LESSEE, said LESSOR shall give credit to the LESSEE for an amount of 33 1/3% of all monies paid in as rental under this lease, except that LESSOR shall give the full credit for the last month's rental paid in the event said option to purchase is exercised before the last month's rental has been accrued and payable, in which latter case credit for only 33 1/3% of said last month's rental shall be given. The credit given as above stated shall act as a down payment, and credit on the amount of purchase price above stated, and LESSEE shall pay the balance to said FORT WORTH and TARRANT COUNTY TITLE COMPANY in escrow at time warranty deed is given. On January 1, 1958, B. J. O'Connor*129 was employed by First Continental Mortgage Company in Fort Worth, Texas. O'Connor had known petitioner since 1946 and was employed by Investors Diversified Services from 1946 to 1957. First Continental Mortgage Company handled between 20 and 25 of the loans on the houses built and sold by petitioner. In February or March of 1958, O'Connor talked with petitioner concerning the solicitation of business for the mortgage company. O'Connor had a second conversation with petitioner at which time petitioner mentioned the houses in Arlington, that he would be selling them in the future and wanted to give the business to First Continental. In May and July of 1958 the Fort Worth, Texas, office of the Federal Housing Administration issued three conditional commitments to First Continental Mortgage Company on the houses built by petitioner. The amount of the credits accumulated by a lessee could be readily determined by how much had been paid in as rental payments. Petitioner wrote letters to tenants advising them of the amount of their credits and directed them to the mortgage company. On May 16, 1958, petitioner sent a letter to Donald Goode advising him he would have $450 to his credit*130 assuming the June, July, and August payments are made. The letter enclosed a contract of sale and also stated that petitioner would arrange to have the house inspected, assist in processing the loan, and make an appointment for Goode at the loan company. During the years in issue petitioner employed a bookkeeper to handle the rental payments, correspondence, and telephone calls. He also maintained an office and employed sales people in connection with the houses in issue. The following schedule sets forth certain data concerning the houses constructed by petitioners in 1958 and 1959: 1958 SALESDateDate ofHoldingFirstSecondDate ofPeriod inSalesCreditsLease (a)Lease (a)Sale (b)Months (1)Price (c)Allowed (d)7-18-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-12$9,400 $4759-21-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-119,4004509-28-578- 1-5810-119,4004508-27-578- 1-5811-129,500(2)8- 5-578- 4-5811-129,4004508-24-578- 5-5811-129,40045010- 5-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-119,550600(2)8-20-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-129,4004507-10-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-149,4005007- ?-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-139,500450.35(2)9-21-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-139,40045011-16-579-11-589-109,4004509- 1-5710- 1-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-139,400450(3)8-23-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-149,500(2)11-23-5710- 6-5810-119,40045010-21-5710- 6-5811-129,500(2)10-15-5710- 6-5811-129,40045010- 1-5710-15-5811-129,4004507- 8-5710-14-5815-169,40050010-28-5710-22-5811-129,4004508-24-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-31-5814-159,500(4)7- 9-5710-29-5711-21-5816-179,700(4)1959 SALES9-27-5711- 1-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-16$9,500(4)11-18-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-159,500(2)12-10-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-179,40060011-27-574-26-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-179,400600(3)10-28-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-199,60062510- 1-585-15-597- 89,600(2)9- 2-573- 7-5811- 4-5926-279,600(3)*131 Most of the houses in issue were sold under loans insured by Federal Housing Administration which qualified for the minimum down payment of 3 percent. In the year 1958, 14 houses were sold to original lessees who exercised their options to purchase; one was leased twice and sold to the second lessee; five were leased once and sold to other persons; and two were leased twice and sold to persons who were not lessees. Of the seven houses sold in 1959, two were sold to original lessees; two were leased twice and sold to the second lessee; two were leased once and sold to other persons; and one was leased twice and sold to another person. Of the six houses sold by petitioner*132 in 1960, two were sold to original lessees; three were leased once and sold to other persons; and one was never leased. No houses were leased as many as three times, and no house was leased for a second time after it became 1 year old. Petitioner financed the purchase of the eight houses acquired from Smithbilt Corporation through loans obtained from Equitable Savings Association. The permanent financing of the houses constructed by petitioner was likewise handled by Equitable Savings Association. Notations on the deeds of trust securing the transactions show that individual properties were released from the deeds of trust and the loans were paid in full. The petitioners realized net cash gains from the sales of the houses in issue, without depreciation, of $52,922.76 in 1958, $16,650.53 in 1959, and $2,328.24 in 1960 for a total of $71,901.53. The petitioners realized a net cash gain or (loss) from the rental of the houses in issue, without considering depreciation, payments on principal or overhead, as follows: 1957($1,552.95)19585,469.771959(106.66)1960( 2,146.78)The petitioners realized a net gain or (loss) from all sources other than the*133 sales of houses in issue as follows: 1958($5,777.84)195911,851.5619608,406.76The houses in issue qualified for loans of 30 years which were insured by Federal Housing Administration. Under Federal Housing Administration procedures a loan insured for a term of 30 years indicates a home having an economic life of at least 40 years. Petitioners reported the gains from the sales of 35 houses as long-term capital gains on their Federal income tax returns as follows: 1958$62,913.47195920,711.7419607,243.32Respondent, however, determined that such gains represented ordinary income. Petitioners claimed depreciation, using the double declining rate of 8 percent annually, on their Federal income tax returns with respect to unsold houses on hand at the end of each year. Respondent allowed in his statutory notices of deficiencies depreciation on these houses only on the straight-line method at the annual rate of 3 percent. Ultimate Finding All of the houses in issue were held by petitioners primarily for sale to customers in the ordinary course of their trade or business during the taxable years 1958, 1959, and 1960. Opinion*134 The primary issue, as previously stated, is whether petitioners realized ordinary income or long-term capital gains from the sale of 35 houses during the years in controversy. It is petitioners' contention that they held the houses for investment as rental properties and that they are entitled to capital gains treatment for the profits realized from the sales. The applicable statute is section 1221(1), Internal Revenue Code of 1954. 2 Respondent, on the other hand, maintains that the profits realized by the petitioners, with certain adjustments for depreciation, should be taxed as ordinary income under section 61(a) 3 since the houses were held primarily for sale to customers in the ordinary course of business. We agree with the respondent. *135 This is entirely a factual question. The same issue has been litigated numerous times and the courts have emphasized that each case must be decided on its own facts. The parties are in agreement that the total factual pattern controls rather than any isolated or specific facts. Both parties apply the following factors considered by the Court of Appeals in Pool v. Commissioner, 251 F. 2d 233 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court, certiorari denied 356 U.S. 938 (1958): 1. The nature and extent of the taxpayer's business. 2. The nature of the acquisition of the property. 3. The activity of the seller about the property, such as the extent of improvements or his activity in promoting sales. 4. The frequency and continuity of sales over a period of time. 5. The extent and substantiality of the transaction, including a comparison of the sales income to the rental income. Viewing the particular facts and pattern in this case against the backdrop of these guideposts developed by the courts, we think it is clear that the petitioners held the property primarily for sale to customers in the ordinary course of their trade or business. *136 As to the nature and extent of the petitioner's business, he admittedly is a home builder. He has either individually, in joint ventures, or in connection with his various corporations, been responsible for building over 2,500 homes. He considers himself well informed on the subject of the Federal Housing Administration and Veterans Administration financing because of his extensive experience. He is active in home building associations and controls several corporations that are actively engaged in the real estate business. Even his Federal income tax returns for 1959 and 1960 disclose that his occupation is home building. Petitioner also had income from other sources including fees and rental income from shopping centers, a service station, and a drive-in food store. In connection with his activities in the rental business, there is no indication that he had ever constructed and rented homes other than the ones here involved. Thus the nature and extent of his business seems to us to be consistent with the respondent's theory of the case. Furthermore, petitioner has indicated that his primary source of income is from his rental operations; however, this is not borne out by his Federal*137 income tax returns. His net rental income when compared with income from the sales of the houses is negligible. As to the nature of the acquisition of the property, we note that the land on which the 30 houses were constructed was acquired by petitioner in 1951. Shortly thereafter he applied for and was issued a Subdivision Report by the Federal Housing Administration, filed plats for the property, and then subdivided it. He reacquired the property from one of his corporations in 1956 and constructed in 1957 houses in his individual capacity. The other eight houses were acquired from his wholly-owned corporation that had previously built them for sale in the ordinary course of its business. All the houses were leased as soon as possible and were sold shortly after they had been leased 1 year. The nature of the acquisition of this property appears to us to fit into the overall pattern of the case. Petitioner either built or acquired the houses for sale and, we think, never intended to hold them for investment. The third factor is the activity of the seller with respect to the property. Petitioner, of course, spent a considerable amount of time in connection with the property when*138 the houses were being constructed. Although he attempted to stress in his testimony that he did not spend much time maintaining the property, the record shows that he hired employees, that his brother represented him in leasing some of the houses, and a secretary handled the books and correspondence. He had direct contact with the lessees on several occasions and assisted in leasing and selling the houses. He also maintained an office at 1901 Glenhaven, which was called the "model home," and he placed advertisements in the Arlington newspapers, discussed financing of the property with the mortgage company, and assisted purchasers in closing their loans and directed them to the mortgage company. In our judgment this constituted a substantial amount of activity. The fourth factor is the frequency and continuity of sales over a period of time. The record shows that the petitioner leased the houses immediately after they were either built or acquired from his corporation. Of the 35 houses involved, 29 were sold approximately 18 months after they were first leased, and all the houses were sold within 2 years after they were first leased. There were some vacancies, however, and on occasions*139 the petitioner was able to obtain a second lessee. On each of these occasions the second lease was executed before the end of the first year. No houses were leased for a second time after 1 year, and none of the houses were leased three times. In the fall of 1958 petitioner was selling houses that had been leased in 1957 at the same time he was acquiring additional houses from Smithbilt Homes, Inc. These facts strongly support the respondent's contention that the petitioner systematically built or acquired the houses, leased them, and then sold them as quickly as his plan of operation would permit. The fifth factor is the extent and substantiality of the transactions. This is best portrayed in the instant case by the following schedule, which is a comparison of net rental income received by the petitioners from the houses in issue as compared to the gains realized by them from the sales of these houses: Cash Gain from Sales of Houses in Issue 195819591960TotalSales price, net$199,824.65$64,775.00$61,894.52$326,494.17Cost and expenses146,901.8948,124.4759,566.28254,592.64Cash gain without depreciation$ 52,922.76$16,650.53$ 2,328.24$ 71,901.53*140 Net Rental Income from Houses in Issue 1957195819591960TotalRentals per return$11,356.25$25,596.50$ 9,895.75$2,405.29$49,253.79Cash expenses12,909.2020,126.7310,002.414,552.0747,590.41Cash gain or (loss) beforedepreciation($ 1,552.95)$ 5,469.77($ 106.66)($2,146.78)$ 1,663.38To summarize the above figures, the petitioners realized a total cash gain, not including depreciation, of $71,901.53 from the sale of the 35 houses in 1958, 1959, and 1960. The net rental income received by them from their houses over a 4-year period amounted to $1,663.38. The net rental figure does not include any allowance for depreciation, nor does it take into consideration payments on the principal of the notes issued to finance the construction of the houses. This figure also does not include overhead expenses of the petitioners attributable to this rental operation, such as salaries, advertisements, and other expenses listed on their returns. Petitioner did not make an allocation of overhead expenses to his various operations. Thus, it is very likely that the petitioner sustained an overall net loss from the rental of the houses*141 in issue. We observe that the net rental figure was computed from the renting of 38 houses, whereas the net sales income was computed on the 35 houses actually sold during the years in issue. Even using the $1,663.38 figure, the gains from the sales of the houses account for over 97 percent of the total income received by petitioners from this property. This is a significant factor. We doubt whether petitioners intended for the rental operation to be profitable. It seems to us that it was simply a necessary part of his overall method of selling the houses since the leasing operation was part of the sales device. Furthermore, the petitioners' gain from the sales of the houses is important when compared to their other income, as shown in the following schedule: 195819591960TotalNet rental income or (loss) per returnsother than houses in issue$11,401.34$14,092.78($ 623.12)$24,871.00All other net business income or (loss)per returns(20,486.92)(589.59)11,842.66(9,233.85)Net profits or (loss) other than housesin issue(9,085.58)13,503.1911,219.5415,637.15Net gain or (loss) on rental of houses inissue after depreciation allowed3,307.74(1,651.63)(2,812.78)(1,156.67)Net profit (loss) from all sources exceptsales of houses in issue(5,777.84)11,851.568,406.7614,480.48Gain on sale of houses in issue per stat-utory notices56,178.8318,812.564,201.3879,192.77Percent of gain from sales of houses inissue to all other income111.46%61.35%33.32%84.54%*142 Hence the petitioners' main source of income during these years was derived from the sales of the houses in question. The whole plan of operation followed a consistent pattern. The houses were built to be attractive to low-income groups. They were advertised in such a way to appeal to home buyers who desired to purchase a house but could not afford the large down payment that would have been required before the houses were a year old. The provisions of the leases concerning the options to purchase and the credits accumulated from rental payments appear to have been geared to meet the minimum Federal Housing Administration down payment requirements that came into effect when the houses were a year old. Still another factor which tends to establish the existence of a trade or business as opposed to a mere liquidation and that sales were made in the ordinary course of petitioners' trade or business is a making of further or additional acquisitions of like properties during the period in which sales of such properties were being made. See Monday v. Commissioner, 252 F. 2d 789 (C.A. 6, 1958), affirming a Memorandum Opinion of this Court. The record here shows that during*143 the months of September, October, and November 1958, the petitioner acquired eight houses from his wholly owned corporation. During these same 3 months of 1958, he sold 11 of the houses that were leased in 1957. Petitioner suggests that he was forced to purchase the eight houses from his corporation because it was having trouble selling houses and needed the money to pay loans that were coming due on which petitioner was personally liable. But petitioner financed his purchase of the houses from the corporation through loans from Equitable Savings Association. Thus, he merely refinanced the loans against the houses and remained personally liable for the same amount. Certainly the advertisements placed in the Arlington Citizen and the Arlington Journal newspapers are inconsistent with the petitioners' theory that they were only holding the property for rental purposes. The advertisements contained the following statements: " $190 Moves You Today," "Many Special Features," "Veterans and Non-Veterans," and "No Closing Costs." Six of the advertisements included the purchase price of $9,400 and one contained the following statement: "Also will trade your equity in on three bedroom, bath*144 and half - FHA." Certainly closing costs and reference to veterans and non-veterans as well as the amount of the purchase price and the other statements are not associated with rental property and imply that the houses were being offered for sale. The import of these advertisements is that petitioner has houses for sale under an arrangement whereby they can be purchased with no initial cash outlay other than the first and last months' rental of $190. Moreover, the houses constructed by the petitioner were all leased under identical agreements entitled "Lease with Option to Purchase." The leases were for a term of 5 years and the lessee was required to pay the first and the last months' rent, which equaled $190, upon signing the lease. The monthly rental of $95 was payable in advance on the first day of each month. Each lessee was required to maintain the property as if he were the fee simple owner. The bottom portion of the leases, entitled "Special Provision - Option to Buy," granted the lessee an option to purchase the property for $9,400 and contained the provision quoted in our Findings of Fact. The minimum down payment for houses insured by Federal Housing Administration that*145 were not inspected during construction and less than 1 year old is 10 percent of the purchase price. The minimum down payment of these houses would have been $940 until they were a year old. Prior to August 5, 1957, the minimum down payment for a house after it was 1 year old, whether inspected or not, was 5 percent and this figure was reduced to 3 percent on August 5, 1957. By the time the lessee had made 12 monthly payments, he would have accumulated total credits of $475, which is determined under the lease by taking one-third of the 12 rental payments, or $380, and adding this figure to the last month's rent of $95 that was paid when the lease was executed. Consequently, at the end of the year, the lessees would have accumulated sufficient credits to meet the minimum down payment, whether $470 for the 5 percent figure that was effective when the houses were first built or the lower figure of $282 for 3 percent financing that became effective before any of the houses were sold. It was very convenient for petitioners to hold the houses at least 1 year for these reasons: (1) After a year the houses qualified for the first time for minimum Federal Housing Administration financing; *146 (2) the lessees would have accumulated sufficient credits by that time to meet the minimum Federal Housing Administration down payment and purchase the house; and (3) the petitioners' holding period for each house would have been more than 6 months for Federal income tax purposes. This plan was also attractive to the lessee. Petitioner testified that the houses were designed to appeal to families in the lower income groups, that is, people earning from three to four hundred dollars a month. It would have been difficult for these people to afford the down payment of $940 that would have been required if the houses had sold before they were 1 year old. Under the special features of the petitioners' plan, they could move in immediately by only paying $190 and could purchase the house at the end of a year without having to pay any additional money since their credits by that time would be sufficient to handle the sale. The plan thus provided a convenient method for people with limited resources to purchase a house. After the houses were leased, the petitioner was active in regard to future sales. In the early part of 1958 he advised B. J. O'Connor of First Continental Mortgage Company*147 that he would be selling the houses and wanted to give the business to him. The petitioner and O'Connor had been friends for a number of years. In May 1958 the Fort Worthoffice of Federal Housing Administration issued conditional commitments to the First Continental Mortgage Company, on two of the houses in Meadowbrook Park. O'Connor inspected the houses as early as May 1958 and the loans on over half of the houses. All the other loans were handled by Murray Investment Company. The petitioner employed a bookkeeper who kept separate records on the houses. She testified that at any given time it could readily be determined from the books how much credit had been accumulated by the lessees. She also handled correspondence for the petitioner. On May 16, 1958, a letter was sent to one of the lessees, Donald Goode, whose lease was executed on September 28, 1957. In this letter petitioner advised Mr. Goode that he would have a credit of $450 when the June, July, and August payments were made, i.e., after Goode had been leasing about 1 year. The letter implied that petitioner would arrange to have the house inspected and process the loan. Petitioner also sent Goode a contract of sale and*148 offered to make an appointment for him at the loan company. In this connection petitioner testified that he directed the lessees to the loan company. Similar letters were sent to the other lessees. This shows that the petitioner actively assisted the purchasers in processing their loans. Petitioner's plan of operation with respect to the eight houses acquired from his corporation was the same as those he built in 1957. They were all leased with option agreements identical to the other leases and contained the same provisions concerning a credit of one-third of rental payments against the purchase price. These houses were also advertised in the "Real Estate" sections of the Arlington Journal and the Arlington Citizen. These advertisements described four of the six houses acquired from Smithbilt by addresses and contained the following statements: "Immediate Possession," "No Closing Costs - No Red Tape," "Our Plan Allows You to Move in and You Are Given Credit for One-Third of Your Monthly Payment Toward Your Down Payment." [Italics supplied.] They also contained the prices of these houses. Again the main thrust of these advertisements was to lure home buyers who could not afford*149 to make the down payment and who were willing to rent the premises at least a year in order to accumulate sufficient credits to purchase the house. The closing papers show that as the houses were sold the sales proceeds were applied against the outstanding loans at Equitable Savings and Loan Association. Petitioner had financed the construction of the houses by interim financing handled by Mercantile National Bank in Dallas, Texas, and the permanent financing was carried by Equitable Savings and Loan Association. The papers introduced into evidence pertaining to these loans contain notations indicating that the individual property was released from the deeds of trust held by Equitable as the houses were sold. Petitioners rely heavily on the case of Kandolph D. Rouse, 39 T.C. 70 (1962), and Smith v. Commissioner, 232 F. 2d 142 (C.A. 5, 1956), reversing a Memorandum Opinion of this Court. In fact, they assert that these two cases are "wholly determinative of the principal issue presented here." We disagree. In our opinion both cases are clearly distinguishable. In Rouse, the taxpayer was not engaged in the business of selling real estate, whereas the petitioner*150 here had an extensive background in building and selling of houses in the ordinary course of business. All of the houses in the Rouse case were built by controlled corporations specifically to be purchased by the taxpayer for rental purposes, whereas in the instant case 30 of the houses were built by petitioners in their individual capacity and eight were purchased from a corporation that had built them for sale in the ordinary course of business. In Rouse, we pointed out as a fact that the leases did not contain options to purchase. But in this case all of the leases contained an option to purchase and further provided that a third of each month's rent would be credited against the purchase price when the option was exercised. In the Rouse case market conditions changed after all the houses had been acquired and no additional houses were purchased after that time. By contrast there is no evidence here of adverse market conditions and the petitioners were acquiring and leasing new houses at the same time they were selling other houses. In Rouse, there was no advertising in newspapers and "for rent" signs were placed on the houses. In this case the petitioners never advertised the houses*151 "for rent" but placed advertisements under the "real estate" section of the newspapers. The Smith case, supra, is one of many which involved the leasing and subsequent sale of houses under controls that were in effect during World War II. Its factual pattern is peculiar to the wartime conditions and is inapplicable to the instant case. Furthermore, the Court of Appeals found in Smith that "on objective tests, economic realization depended on rentals." Here the economic realization depended on the sale of the houses. Petitioners advance some arguments which require comment. They state that because of depressed market conditions they decided to enter the rental housing business. We find insufficient evidence in the record to support this contention. Then, they state that they had long been in the residential rental business. This is likewise unsupported by the record. It is also stressed that there was a serious danger the houses would become vacant if the petitioners had not consented to the exercise of the options and that this would have resulted in financial disaster. The obvious answer to this is that there is no requirement in the leases that the petitioners consent to the*152 exercise of the option. In fact, such a provision would be repugnant to the option concept. The lessees were granted an option to purchase the houses at designated prices during the periods of the leases. Both parties have cited a number of other cases and have made other arguments, all of which we have examined and considered. However, we find that they are not sufficiently close or persuasive to warrant discussion. Looking as we do at the totality of the evidence presented - the petitioner's extensive activities in the real estate business, the purposes for which he acquired and developed the properties, the promotional methods used to sell the houses, the frequency and pattern of sales, and the substantial gains realized from the sales as compared to the small rental income - we reach the ultimate conclusion that the houses were held primarily for sale to customers in the ordinary course of petitioners' trade or business. Cf. Tomlinson v. Dwelle, Jr., 318 F. 2d 60 (C.A. 5, 1963). Therefore, we hold for the respondent on this issue. We turn finally to the subsidiary question as to whether the petitioners are entitled to accelerated depreciation at an 8 percent*153 rate for certain houses on hand at the close of the taxable years involved. Although we have decided that all of the houses in issue were held primarily for sale to customers in the ordinary course of petitioners' business, thereby precluding any allowance for depreciation, the respondent has nevertheless allowed depreciation, based on a 3 percent straight-line method, with respect to 16 houses on hand at the end of 1958, three houses on hand at the end of 1959, and three houses on hand at the end of 1960. Consequently, we do not disturb this allowance. Decisions in both dockets will be entered under Rule 50. Footnotes1. Consolidated herewith is the proceeding of Harold F. Smith and Gertrude Smith, Docket No. 4041-62.↩a. Dates taken from colunm entitled "Date of Lease" in Ex. 4D and 6F. ↩b. Dates taken from Column 8 of Ex. 4D and Column 6 of Ex. 6F. ↩1. Represents period between date first leased and date closed. ↩c. Figures taken from Column 9 of Ex. 4D and Column 7 of Ex. 6F. ↩d. Figures taken from Column 10 of Ex. 4D and Column 8 of Ex. 6F.↩2. Houses leased once and sold to other persons. ↩3. Houses leased twice and sold to second lessee. ↩4. Houses leased twice and sold to other persons. ↩2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. ↩3. All Code references herein are to the Internal Revenue Code of 1954.↩